# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 15-10438
Consolidated with No. 15-10551

United States Court of Appeals
Fifth Circuit

**FILED**

June 30, 2016

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

JOSE LUIS BEDOY,

Defendant–Appellant.

Appeals from the United States District Court
for the Northern District of Texas

Before HIGGINBOTHAM, PRADO, and GRAVES, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Jose Luis Bedoy, a former detective in the Dallas Police Department, was convicted of four counts of obstruction of justice related to a grand jury investigation. The investigation focused on Bedoy, who was suspected of giving sensitive law enforcement information to a prostitute in exchange for sexual relations. The district court granted Bedoy's post-trial motion for judgment of acquittal on Count Three but denied it on Counts One, Two, and Four. On appeal, Bedoy challenges the sufficiency of the evidence for the three remaining counts. Alternatively, he argues that the district court reversibly erred by admitting at trial two taped telephone calls. The Government cross

No. 15-10438 cons. w/ No. 15-10551

appeals the judgment of acquittal on Count Three. We AFFIRM the convictions on Counts One, Two, and Four, VACATE the judgment of acquittal on Count Three, and REMAND for reinstatement of the jury verdict and for sentencing.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A.     Factual Background

Defendant–Appellant Jose Luis Bedoy was a detective in the Vice Division of the Dallas Police Department ("DPD"). In 2009, he met Syndia "Sysy" Guerbi, an undocumented immigrant from France. They came into contact after she was arrested in a DPD raid of a massage studio where she worked as a prostitute.

Bedoy and Sysy remained in contact from then until 2013. During this time, Bedoy provided Sysy with information about law enforcement that would help her avoid getting caught, such as when the DPD's Vice Division would be "working" Backpage.com, a website she used to advertise prostitution. In exchange, Sysy provided Bedoy sexual favors, including erotic massages.

In late 2012, Bedoy told Sysy that the DPD was going to investigate either Studio Wet or Studio Serene, two prostitution parlors. At trial, Sysy testified that Bedoy knew she worked at Studio Serene and that she "asked him not to go after Studio Serene." Bedoy responded that he would target Studio Wet. Prior to the DPD's raid of Studio Wet, Bedoy warned Sysy about when it would happen and said to tell her friends who worked there "not to come to work" on that day. In early 2013, Bedoy sent Sysy a text message: "You owe me big time." Sysy testified that Bedoy meant that she owed him for warning her about the Studio Wet raid and for not targeting Studio Serene. Soon after, Bedoy and Sysy had sexual intercourse to satisfy the debt he claimed she owed.

Later in 2013, Bedoy told Sysy that a police department other than the DPD was investigating Studio Serene. Although Sysy no longer worked there,

2

she relayed this information to a former co-worker named Shona and Studio Serene's owner, Brenda Mazzei. The Coppell Police Department ("CPD") executed a search warrant on Studio Serene in April 2013. Mazzei told the CPD that she had been "tipped off" about the raid through one of the "girls" who "had a relationship with [a] DPD officer."

The CPD relayed Mazzei's statements to the DPD. After determining that Bedoy was the officer to whom Mazzei was referring, the DPD informed the FBI's public corruption section. Two FBI Special Agents, Kevin Minor and Jennifer Chapman, began to investigate Bedoy, and a federal grand jury was empaneled based on these allegations. Minor and Chapman interviewed Mazzei who agreed to act as a cooperating witness. With Mazzei's assistance, Minor and Chapman contacted Sysy. Sysy also agreed to cooperate and allowed the FBI to tape her phone calls with Bedoy, the first of which occurred in June 2013. In several of the recorded calls, Bedoy told Sysy when she should work—e.g., "weekends are good"—and when she had to "watch out." He also intimated that she should deny that he provided such information: "You didn't get that from me, though. Ok?"

On July 8, 2013, Minor and Chapman had Mazzei call Bedoy. Bedoy hung up after Mazzei said she was calling about Sysy and Shona. Bedoy then called Sysy, saying he had received a call from a person whose name "started with a 'B.'" He explained to Sysy that he told the person who called, "No, you got wrong number," and that he "just hung up on 'em." He then stated, "I['m] just hoping you haven't told anyone anything . . . . Like, ya know, talking or anything like that."

Mazzei called Bedoy several minutes later. She said, "The girls at the studio are telling me that the FBI is looking for Sysy . . . because they're having a grand jury investigation, about somebody . . . that was giving her information." After this call, Bedoy again called Sysy to recount his

conversation with Mazzei. In particular, he said that he just got a call from "Brenda" and that "she said, 'Hey, I know that you were friends with Sy[s]y. I need her number. The FBI's looking for her. And you know, they got a grand jury investigation."

### 1. The Basis for Count One: the July 8 and 9, 2013 Phone Calls

Around July 8 and 9, Bedoy made the statements that formed the basis for Count One, which charged Bedoy with attempting to obstruct an official proceeding in violation of 18 U.S.C. § 1512(c)(2) by telling Sysy to move and not to give her real name if stopped by the police. For instance, later in the same July 8 conversation in which he told Sysy about the Mazzei phone call, he told Sysy multiple times to "move" and "leave Dallas."

During these conversations, Bedoy at times expressed disbelief about what Mazzei had told him and assured Sysy that the FBI was not looking for her. However, he also offered explanations as to why the FBI would have begun investigating. As he surmised, Mazzei must have said, "I know . . . one of my girls is fucking . . . a detective in, in Dallas. Or something like that. She's trying to deflect."

Bedoy also told Sysy how to respond if she was asked about their relationship: "If you know me, yes you do. And how do you know him. 'Hey ahh, I helped him on cases.' . . . . It's not illegal for me to talk to you. It's not illegal for you to give me information on a place." In a subsequent phone call, he again opined about Mazzei's circumstances, suggesting that "[h]er court's coming up" and that "they're trying to tell her, 'Hey, let's . . . get ah . . . plea bargain[,] let's do something." During this phone call, Special Agent Minor instructed Sysy to tell Bedoy that Mazzei was at her door. Bedoy replied, "Don't answer. I wouldn't see her."

Later on July 8, Sysy called Bedoy. She told him that Mazzei had said:

[T]he FBI, went to the studio, and talked to the girls . . . . [T]hey told the girls, that there is a public corruption investigation and that they heard that Sy[s]y and [Shona] were getting information in, against sexual service from a cop.

Bedoy replied, "[T]hat's just bullshit. They don't investigate that."

The next day, July 9, Bedoy sent Sysy multiple text messages telling her to call him. When they eventually spoke, Bedoy again suggested that Mazzei was "trying to deflect." He again told Sysy to consider moving. He added, "[I]f anyone knocks, you don't need to be talking to nobody at all."

After they hung up, Bedoy called back within ten minutes. He repeated his theory that Mazzei is "trying to deflect . . . . [S]he's probably like 'Oh, you know what? . . . I know this cop that knows somebody and . . . he gives information.'" Sysy responded, "[I]f somebody ever asks me [a] question, I just say I don't know you." Bedoy repeated his explanation of their relationship— "I didn't give you information. You, you give me information"—but said that Mazzei must have thought "it's the other way around."

Bedoy also cautioned Sysy that Mazzei might try "to send somebody over there to talk to you." When Sysy asked who Mazzei would send, he said, "like the prosecution might . . . ya know they always try to get an investigator [to] [f]ollow up." Sysy assured him that she would not open the door for anybody unless there was a warrant. Bedoy agreed: "Exactly! You don't talk to anyone." He also said that "if someone wants to ask you anything," she should respond, "I don't trust cops. I need an attorney."

Sysy expressed her concern about her daughter and "getting deported." Bedoy told her she did not have worry but also suggested that she "lay real low," change her car, and move. He also reminded her "don't open the door to talk to anybody." Then, as is pertinent to Count One, he said: "If you ever get pulled over by any, anybody. You don't give your real name. If you don't have a license . . . . Because you don't ever want to give your name."

No. 15-10438 cons. w/ No. 15-10551

### *2.  The Basis for Count Two: the July 11, 2013 Phone Call*

Bedoy's phone call with Sysy on July 11 formed the basis of Count Two, which charged Bedoy with attempting to obstruct an official proceeding in violation of 18 U.S.C. § 1512(c)(2) by telling Sysy not to let anyone into her apartment to talk to her, including FBI agents. During the call, they discussed Studio Serene. As he told Sysy, "the place is closed[,]" "you don't ever have to admit you worked there[,]" and "[y]ou don't have to tell anyone anything." Sysy then asked what to do if the police or the FBI tried to talk to her. Bedoy answered, "You don't have to open your door to anyone" and "don't talk to anyone. At all." Bedoy also repeated to Sysy how she should respond if questioned about their relationship: "[I]f anyone ever ask[s], 'It's someone I've help 'em with some [of] his cases.' That's it." He averred that Mazzei must have thought their relationship was "illegal" but that it was not illegal for him to talk to her. He then said: "I mean, did I tell you where to work, and not to work? . . . I never told you, where to work, and where not to work."

Sysy again wondered if she could turn down the police or "even the FBI." Bedoy reiterated, "[N]obody can come in, and I wouldn't answer the door, for anyone," and "let no one else, inside your, your apartment."

### *3.  The Basis for Count Three: the July 14, 2013 Phone Call*

On July 12, 2013, DPD Vice Detective Paul Park showed pictures of Sysy and another woman to members of the Vice Division, including Bedoy, and asked if anyone recognized them. Park was acting on the FBI's instructions. As Park testified, after seeing the pictures, Bedoy took him into an office storage room and asked "what was going on with the pictures." Park explained that Bedoy should call FBI Special Agent "Kevin Minor and give him whatever information [he] ha[d] on [Sysy]" because "they're getting a federal grand jury together" and "they wanted to ask these two ladies some questions."

6

Two days later, on July 14, the last recorded phone call between Bedoy and Sysy occurred. This call formed the basis for Count Three, which charged Bedoy with attempting to obstruct an official proceeding in violation of 18 U.S.C. § 1512(c)(1) by telling Sysy to get rid of her cell phone. Bedoy said that he gave his previous phone to his wife and that he was leaving the Vice Division to work "patrol." He also reminded Sysy that Mazzei, who he said had been indicted, "can take whoever she wants down with her."

Bedoy advised Sysy that if she was charged with a crime, it was possible that she would be deported and that, as for her daughter, "they['ll] call CPS.[1] Call the Dad. Now Daddy can have the girl." He reinforced that he already told her what she had to do: "[G]et out of this area. Period." Sysy expressed concerns about being arrested and losing her daughter, saying "I need to cut off all my shit. Time Warner Cable, . . . ADT. Everything." Bedoy confirmed that she "need[s] to move" and, if she was to "open something," use a "different name."

As pertinent to Count Three, he said, "You need to change your phone . . . . [W]hat I would do . . . ya know, I would cut everything . . . any tie." Bedoy also again provided his theory of their relationship—Sysy gave him information and "he talks to [her] like a friend. That's it." He added, "[W]as there anything more than that? No absolutely, not."

Later in that call, Bedoy repeated that Sysy "need[ed] to move outta here. And different phone." He explained:

> If I were you. Different phone, and you need to move. I think. And if you don't . . . then you gonna be remembering me . . . whew you gonna be like, 'Shit, I shoulda listened.' . . . But the only way that you can be found is to be around.

---

[1] The parties do not dispute that CPS refers to Child Protective Services.

#### 4. *The Basis for Count Four: the July 23 Meeting with the FBI*

On July 23, 2013, Bedoy voluntarily met with FBI Special Agents Minor and Chapman. Their conversation formed the basis of Count Four, which charged Bedoy with endeavoring to obstruct the due administration of justice in violation of 18 U.S.C. § 1503 by falsely stating to FBI agents that he never gave Sysy any sensitive law enforcement information. At the meeting, Minor relayed that a tip from the Coppell police suggested "that local law enforcement may be giving these ladies information and that we subsequently opened a grand jury investigation based on that information." Bedoy proceeded to tell the agents that he did not know Sysy's name, although he had used her as a source, and that he did not have her phone number or have any additional information about her identity or location.

Suspecting that Bedoy was concealing information, Minor advised Bedoy that "he was the target of the federal grand jury investigation" that the FBI had opened and that if he lied or withheld information "he could be charged with obstruction or lying to a federal agent." Minor testified at trial that as the conversation continued, Bedoy admitted that he and Sysy "jokingly sent messages about giving one another massages" but was "adamant that they didn't conduct any of that activity or sexual activity."

Minor also asked Bedoy if he had ever tipped Sysy off by providing law enforcement information. As pertinent to Count Four, Bedoy responded that although she "knew the nature of his investigation[s] based on their relationship" he never "directly" gave Sysy such information.

### B.    Procedural Background

In November 2013, Bedoy was charged in a four-count indictment. Counts One and Two charged him with violating 18 U.S.C. § 1512(c)(2), Count Three charged him with violating 18 U.S.C. § 1512(c)(1), and Count Four charged him with violating 18 U.S.C. § 1503.

No. 15-10438 cons. w/ No. 15-10551

On October 1, 2014, two days before his trial was set to start, Bedoy moved for a continuance. In his motion, he noted that during the previous evening the Government had disclosed that Mazzei and Sysy had continued to engage in prostitution while assisting the FBI. He argued that a continuance was needed "to investigate [this] impeachment evidence." The district court held a hearing the next day. Although the continuance was denied, the Government stated it would not call Mazzei at trial and agreed to stipulate that Sysy falsely told the Government that she was not engaged in prostitution while cooperating with the FBI when in fact she was.

The following day—the first day of trial—Bedoy filed a motion in limine to exclude the recording of the two phone calls between Mazzei and Bedoy from July 8, 2013. Bedoy explained that because the Government promised not to call Mazzei as a witness at trial, it would have to rely on the testimony of an FBI agent to prove that she consented to being recorded. According to Bedoy, the use of such "hearsay evidence" regarding her consent would violate his confrontation rights under *Crawford v. Washington*, 541 U.S. 36 (2004), and that, absent permissible evidence of consent, the tapes must be suppressed pursuant to the Federal Wiretap Act, 18 U.S.C. § 2515. The district court denied the motion, although it also ruled that the Government could not introduce the consent form that Mazzei had signed.

During the trial, Bedoy moved for judgment of acquittal on all counts at the close of the Government's case in chief and at the close of all the evidence. The Court denied both motions.

The jury found Bedoy guilty on all four counts. After the trial, Bedoy renewed his motion for judgment of acquittal. The court denied the motion on Counts One, Two, and Four but granted it on Count Three, reasoning that the indictment had been constructively amended. The district court sentenced Bedoy to 18 months imprisonment for each remaining Count to run

9

No. 15-10438 cons. w/ No. 15-10551

concurrently and imposed a $25,000 fine and a $300 special assessment. This appeal and cross appeal followed.

## II. DISCUSSION

### A.    Count Four – 18 U.S.C. § 1503(a)

Bedoy argues that the evidence was insufficient to support his conviction on Count Four, which charged him with violating 18 U.S.C. § 1503.

We review a sufficiency-of-the-evidence challenge de novo where, as here, the defendant has timely moved for judgment of acquittal. *United States v. Winkler*, 639 F.3d 692, 696 (5th Cir. 2011). Our inquiry, however, is "highly deferential to the verdict." *United States v. Roetcisoender*, 792 F.3d 547, 550 (5th Cir. 2015) (quoting *United States v. Beacham*, 774 F.3d 267, 272 (5th Cir. 2014)). "Sufficiency review essentially addresses whether 'the government's case was so lacking that it should not have even been submitted to the jury.'" *Musacchio v. United States*, 136 S. Ct. 709, 715 (2016) (quoting *Burks v. United States*, 437 U.S. 1, 16 (1978)). Thus, we consider "only the 'legal' question 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). This "limited review does not intrude on the jury's role 'to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" *Id.* (quoting *Jackson*, 443 U.S. at 319); *see also United States v. Thompson*, 647 F.3d 180, 183 (5th Cir. 2011) ("Credibility determinations and reasonable inferences are resolved in favor of the jury's verdict.").

The catch-all clause of 18 U.S.C. § 1503(a), under which Bedoy was charged, prohibits an individual from "corruptly . . . endeavor[ing] to influence, obstruct, or impede, the due administration of justice." Count Four of the indictment alleged Bedoy violated this provision "[o]n or about July 23, 2013,"

by "falsely stating" to FBI agents that he "never directly gave [Sysy] sensitive law enforcement information."

In order to sustain a conviction under § 1503(a), the Government must establish beyond a reasonable doubt: "(1) that a judicial proceeding was pending; (2) that the defendant had knowledge of the judicial proceeding; and (3) that the defendant acted corruptly with the specific intent to influence, obstruct, or impede that judicial proceeding in its due administration of justice." *United States v. Richardson*, 676 F.3d 491, 502 (5th Cir. 2012).

In *United States v. Aguilar*, 515 U.S. 593 (1995), the Supreme Court clarified that § 1503(a) imposes "a 'nexus' requirement"—"the act must have a relationship in time, causation, or logic with the judicial proceeding. In other words, the endeavor must have the 'natural and probable effect' of interfering with the due administration of justice." *Id.* at 599 (internal citations omitted) (quoting, e.g., *United States v. Wood*, 6 F.3d 692, 695 (10th Cir. 1993)). Consequently, the defendant must have "'knowledge that his actions are likely to affect the judicial proceeding,' as opposed to some ancillary proceeding, such as an investigation independent of the court's or grand jury's authority." *Richardson*, 676 F.3d at 502 (quoting *Aguilar*, 515 U.S. at 599).

The parties dispute the meaning of *Aguilar*. In that case, a federal district court judge, Robert Aguilar, was under investigation for attempting to influence a federal habeas petition pending before another judge in his district. *Aguilar*, 515 U.S. at 595. The habeas petition had been filed by a person associated with an acquaintance of Judge Aguilar. *Id.* The acquaintance, Abe Chapman, had spoken with Judge Aguilar about the filing. *Id.* at 595–96. After conferring with Chapman, Judge Aguilar talked to the district court judge handling the habeas petition. *Id.* at 596. Judge Aguilar was also under investigation for telling Chapman that Chapman's phone had been wiretapped. *Id.* at 596–97. In a subsequent interview with FBI agents, Judge

Aguilar "lied about his participation in the [federal habeas] case and his knowledge of the wiretap." *Id.* at 597. He was convicted of violating § 1503(a)'s catch-all provision. *Id.* at 597–98.

The Supreme Court reversed his conviction, holding that no rational jury could find that Judge Aguilar possessed the requisite intent to obstruct a grand jury proceeding. *Id.* at 599–601. After defining the nexus requirement, the Court found that "uttering false statements to an investigating agent—and that seems to be all that was proved here—who might or might not testify before a grand jury" was insufficient to prove a violation of § 1503(a)'s catch-all provision. *Id.* at 600.

In so holding, the Court emphasized two points. First, there was no evidence that the FBI agents "acted as an arm of the grand jury." *Id.*; *see id.* at 597 (noting that the court of appeals had found that "the grand jury had not authorized or directed the FBI investigation"). Second, the record did not support the government's argument that Judge Aguilar "understood that his false statements would be provided to the grand jury" and that "he made the statements with the intent to thwart the grand jury investigation and not just the FBI investigation." *Id.* at 600. The government had cited a transcript in which the FBI agent, in response to Judge Aguilar's question whether he was the target of the grand jury investigation, stated: "[T]here is a Grand Jury . . . [c]onvening" and "some evidence will be heard I'm . . . sure on this issue." *Id.* at 600 (first and fourth alterations in original). The Court rejected the claim that this transcript citation could "enable a rational trier of fact to conclude that [Judge Aguilar] knew that his false statement would be provided to the grand jury." *Id.* at 601. Rather, the evidence went "no further than showing that [Judge Aguilar] testified falsely to an investigating agent." *Id.*

On appeal, Bedoy claims that *Aguilar* means that he must actually know that his false statements will be presented to the grand jury. We disagree.

Although the government in *Aguilar* argued that the defendant had actual knowledge, the Supreme Court found that no such knowledge existed in that case. The Court, however, did not expressly hold that actual knowledge is a necessary element of the nexus requirement. *See id.* at 600–02. Instead, the Court held that the nexus requirement only demands that the defendant believe his statements "are *likely* to affect the judicial proceeding." *Id.* at 599 (emphasis added); *see id.* at 601–02 ("[Section 1503(a)] makes conduct punishable where the defendant acts with an intent to obstruct justice, and in a manner that is likely to obstruct justice, but is foiled in some way.").

Indeed, this Court rejected a similar argument in *United States v. Jena*, 478 F. App'x 99 (5th Cir. 2012) (per curiam). In *Jena*, the defendant was charged with causing his attorney to submit forged documents to the prosecution in the course of the pre-trial discovery process. *Id.* at 102 n.2. The defendant claimed that there was "an insufficient nexus between [transferring the documents to the prosecution] and the jury's deliberations." *Id.* at 102. This Court was unpersuaded. Citing *Aguilar*, it explained that the government did not need to prove that "submitting fraudulent letters[] actually affected the judicial proceeding, but only that the conduct could have." *Id.*

Alternatively, Bedoy contends that, to satisfy the nexus requirement, the FBI agents must have at a minimum warned him that they had been subpoenaed to testify before the grand jury. According to Bedoy, the evidence was thus insufficient as the FBI agents that interviewed him testified at trial that they did not explicitly tell Bedoy that they had been summoned by the grand jury or that his statements would otherwise be placed before it. The Government responds that Bedoy misreads *Aguilar*. It highlights that *Aguilar* states that a defendant need only know his statements would have the "probable" effect of influencing the grand jury proceeding. The Government claims the evidence is sufficient to prove the requisite nexus because Bedoy

13

lied to the FBI agents after they informed him that (1) he was the target of a grand jury investigation, (2) those agents were directly connected to that investigation, and (3) he could be charged with obstruction for lying.

As suggested by *Aguilar*, a conviction may be sustained under § 1503(a) if the prosecution proves what it did not in that case: the FBI agents were acting as the "arm of the grand jury." 515 U.S. at 600. Put differently, the nexus requirement may be satisfied where a rational jury could find that the defendant "understood that the [investigating] agents were 'integrally involved' in th[e] grand jury investigation." *United States v. Fassnacht*, 332 F.3d 440, 449 (7th Cir. 2003); *see also United States v. Dwyer*, 238 F. App'x 631, 650 (1st Cir. 2007) (applying the Seventh Circuit's "integrally involved" standard). Contrary to Bedoy's contention, proof of such involvement does not require the FBI agents to explicitly state that they had been subpoenaed to appear before the grand jury. *Cf. United States v. Hopper*, 177 F.3d 824, 830 (9th Cir. 1999) (recognizing that *Aguilar* provides that "had the investigators been subpoenaed or summoned by the grand jury, *or* had there been proof that they were acting as an arm of the grand jury, there would have been enough to support a conviction for obstructing a judicial proceeding" (emphasis added)).

However, the fact that Bedoy was told that he was the focus of a grand jury investigation—by itself—is not enough to satisfy the nexus requirement. As the dissent in *Aguilar* noted, the evidence "established that [the defendant] knew a grand jury had been convened" and "that he had been told he was a target of its investigation." 515 U.S. at 614 (Scalia, J., dissenting). Thus, in this case, the prosecution had to prove that Bedoy understood the FBI agents to whom he lied were connected to that grand jury investigation rather than acting pursuant to "an investigation independent of . . . the grand jury's authority." *Id.* at 599.

14

No. 15-10438 cons. w/ No. 15-10551

The Government established the requisite nexus between Bedoy's false statements and the grand jury proceeding. The evidence would allow a rational jury to conclude that, during the interview with the FBI agents, Bedoy was aware of the grand jury's investigation into his relationship with Sysy and that the FBI agents to whom he lied were "integrally involved" in that investigation. *Fassnacht*, 332 F.3d at 449. As Special Agent Minor testified, he not only advised Bedoy "that he was the target of the federal grand jury investigation;" he also informed Bedoy that "*we* . . . opened a grand jury investigation" after learning that "local law enforcement may be giving" prostitutes "information." Indeed, Minor later answered in the affirmative when asked if he told Bedoy that the FBI was involved in initiating the federal grand jury investigation. Even before this meeting, DPD Detective Park had asked Bedoy to call Special Agent Minor to give him information on Sysy because "they're getting a federal grand jury together" and "they wanted to ask [her] some questions." Further, Minor warned Bedoy at the July 23 meeting that "if the investigation proved that he was dishonest or withholding information, he could be charged with obstruction or lying to a federal agent."

Bedoy, however, lied after an FBI agent told him that the FBI had been involved in opening a grand jury investigation of which he was the target and that he could be charged with obstruction. As Minor testified, Bedoy specifically denied that he "directly" gave Sysy law enforcement information. In contrast, the trial evidence indicated that Bedoy had provided Sysy such information, such as where and when police would investigate or raid prostitution targets.

The evidence adduced at trial, including the testimony of Special Agent Minor, thus distinguishes this case from *Aguilar*. Such evidence was sufficient to show that Bedoy understood the FBI agents "were acting as the 'arm of the grand jury,' and that impeding the agents' efforts necessarily meant

15

obstructing the grand jury." *Id.* at 451. Consequently, the jury's guilty verdict on Count Four is affirmed.

**B.    Counts One and Two – 18 U.S.C. § 1512(c)(2)**

### *1. Sufficiency of the Evidence as to Counts One and Two*

Bedoy also claims that the evidence was insufficient to support his conviction under Counts One and Two, which charged him with violating 18 U.S.C. § 1512(c)(2). Section 1512(c)(2) prohibits "corruptly . . . obstruct[ing], influenc[ing], or imped[ing] any official proceeding, or attempt[ing] to do so." We have recognized that § 1512(c)(2), like § 1503(a), requires a nexus between the alleged act and the official proceeding. *See United States v. Bennett*, 664 F.3d 997, 1013 (5th Cir. 2011), *vacated on other grounds by* 133 S. Ct. 71 (2012)*; see also United States v. Petruk*, 781 F.3d 438, 445 (8th Cir. 2015). However, unlike § 1503(a), the "official proceeding need not be pending or about to be instituted at the time of the offense" to prove the defendant violated § 1512(c). 18 U.S.C. § 1512(f)(1). It is sufficient if the proceeding was "'foreseen,' such that the defendant has in contemplation some particular official proceeding" that he intends his conduct would impede or obstruct. *United States v. Simpson*, 741 F.3d 539, 552 (5th Cir. 2014).

Count One charged Bedoy with violating § 1512(c)(2) by telling Sysy "to leave Dallas and move somewhere else and by instructing [her] to never give her real name if she is pulled over in a traffic stop by law enforcement." Count Two charged Bedoy with violating § 1512(c)(2) by instructing Sysy not to let "anyone into her apartment to talk to her, including [FBI] agents."

Bedoy does not dispute that he made the statements as charged in Counts One and Two. Rather, he contends that the evidence was legally insufficient to establish the requisite nexus. He claims that no rational jury could conclude that (1) he knew of or foresaw a federal grand jury proceeding or (2) acted with the intent to impede or obstruct it.

16

We find his argument unavailing. To begin, the trial evidence included statements from Bedoy and Sysy that expressly mention the FBI and a grand jury. During a July 8 phone call with Sysy, Bedoy said that Mazzei had just told him that "[t]he FBI's looking for her. And you know, they got a grand jury investigation." When Sysy called him later that day, she told him that Mazzei had come to her apartment and said:

> [T]he FBI, went to the studio, and talked to the girls . . . . [T]hey told the girls that there is a public corruption investigation and that they heard that Sy[s]y and [Shona] were getting information in, against sexual service from a cop.

A rational jury could infer that Bedoy knew of or foresaw a grand jury investigation after being directly told that one existed.

Bedoy also averred as to why that proceeding may have been initiated. In his phone call with Sysy in which he relayed what Mazzei had told him, he suggested that Mazzei may have told authorities "I know . . . one of my girls is fucking . . . a detective in, in Dallas. Or something like that. She's trying to deflect." He also said:

> [T]hey're investigating something. You know, the only thing I can think of, is that [Mazzei] . . . she's trying to deflect and say shit like . . . that you've been able to work . . . you were being allowed to work . . . because . . . I knew, I know you girls.

Bedoy identified the event that precipitated the investigation: Mazzei talking to authorities. Such insight regarding the basis for the grand jury investigation supports the inference that he knew or believed one existed.

Bedoy counters that these statements are legally insufficient to show he knew of or foresaw a grand jury proceeding because throughout his conversations with Sysy he also expressed doubt about what Mazzei had told him. For example, at one point in reference to Mazzei he said, "[I]t's full of shit[,] [w]hat she's talking about." Although Bedoy is correct that his statements of disbelief *could* support an inference that he did not know of or

foresee a grand jury investigation, we "are not free to second-guess the jury's choice of one view of the evidence over another." *United States v. Harris*, No. 15-50106, 2016 WL 1720046, at *10 (5th Cir. Apr. 28, 2016). Based on the evidence, a rational jury could infer that Bedoy knew of or foresaw a grand jury investigation after being told one existed and offering an accurate account of what led to it.

Bedoy also argues that even if he was thinking of a grand jury, he was only thinking of a state proceeding. He contends that he assured Sysy that the FBI is not involved and, in turn, did not know of or foresee the federal nature of the proceeding. Notably, Bedoy concedes that 18 U.S.C. § 1512(g)(1) provides that "no state of mind need be proved with respect to" whether the proceeding is federal to prove § 1512(c) was violated. He claims, however, that the Government assumed the burden of proving he knew there was a federal proceeding in this case because both the indictment and the jury instructions added this as an element. In support, he cites *United States v. Jokel*, 969 F.2d 132 (5th Cir. 1992) (per curiam), which held that a jury instruction "that increases the government's burden and to which the government does not object becomes the law of the case." *Id.* at 136.

However, *Jokel* is no longer good law. After briefing was completed in this case, the Supreme Court issued *Musacchio v. United States*, 136 S. Ct. 709 (2016), which abrogated Fifth Circuit precedent to the extent it provided that "erroneously heightened jury instructions generally become the binding 'law of the case' on appeal." *Id.* at 714; *see also United States v. Musacchio*, 590 F. App'x 359, 362 (5th Cir. 2014) (per curiam) (citing *Jokel*). The Court held that "when a jury instruction sets forth all the elements of the charged crime but incorrectly adds one more element, a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction." *Musacchio*, 136 S. Ct. at 715.

Thus, in light of *Musacchio*, we reject Bedoy's argument that the jury instructions can and did heighten the Government's burden.

But *Musacchio* left open the question of whether a sufficiency challenge "must be judged by reference to the elements charged in the indictment, even if the indictment charges one or more elements not required by statute." *Id.* at 715 n.2. Because Bedoy also argued that the indictment heightened the Government's burden, *Musacchio* does not completely foreclose his argument. However, we need not resolve whether an indictment can add an element that becomes the law of the case or whether the indictment did so here by requiring the Government to prove Bedoy knew there was a federal proceeding. Even assuming—without deciding—the Government had to prove this additional element, Bedoy's and Sysy's repeated references to the FBI and the grand jury would allow a rational jury to infer he knew or foresaw that the grand jury proceeding was a federal one.

Lastly, Bedoy claims that his intent was not to impede the grand jury proceeding but rather to protect Sysy from retribution from other prostitutes or from being deported. Specifically, he cites the numerous instances in his conversations with Sysy in which he worried that "the girls" were "out to get her."

This argument lacks merit. The prosecution can "prove the defendant['s] intent or knowledge by 'circumstantial evidence alone.'" *United States v. Rojas*, 812 F.3d 382, 400 (5th Cir. 2016) (quoting *United States v. Medina*, 161 F.3d 867, 872 (5th Cir. 1998)); *see also United States v. Sandlin*, 589 F.3d 749, 755 (5th Cir. 2009) ("Absent a confession, intent will almost always have to be established by circumstantial evidence."). Here, sufficient circumstantial evidence existed to allow a rational jury to conclude that he was concerned about a grand jury investigating his relationship with Sysy and acted with the intent to impede that investigation. On July 8, after receiving the first phone

call from Mazzei, Bedoy told Sysy, "I['m] just hoping you haven't told anyone anything . . . . Like, ya know, talking or anything like that. Just don't ah ya know?"

In addition, the timing of the statements at issue for Counts One and Two—i.e., telling Sysy to move and not to answer the door—also supports the verdict. He made these statements both the day of and the day after he was told about the FBI and the grand jury investigation. Moreover, Bedoy's intent can be inferred from the evidence suggesting that he instructed Sysy on how to respond if she were asked about their connection: "If you know me, yes you do. And how do you know him. 'Hey ahh, I helped him on cases.' . . . It's not illegal for me to talk to you."[2] Such evidence is sufficient to allow a rational jury to conclude that Bedoy acted with the specific intent to influence or impede the grand jury investigation.

### 2. Sufficiency of the Evidence as to Count Two Only

Bedoy asserts that, as to Count Two only, there is another reason the evidence is insufficient to prove he acted with the requisite *mens rea*—i.e., "corruptly." He claims that there was "nothing improper" about instructing Sysy not to let the FBI into her apartment to talk to her because he was merely advising her in a manner consistent with her constitutional rights.

In this case, the jury instructions defined "corruptly" as "to knowingly and dishonestly act with the specific intent to obstruct, influence or impede a federal official proceeding." Neither party contends that this is an incorrect statement of law, and it tracks the definition contained in our pattern jury instructions for 18 U.S.C. § 1503(a)'s catch-all provision. *See* Fifth Circuit

---

[2] Bedoy's concern with a grand jury proceeding can also be inferred from the fact that he deflected when Sysy said that it might be discovered that they had sexual intercourse. At first, when she mentioned it, he responded, "Hey! Hey! Who, hey, who, who knows that. Nobody knows that." However, when Sysy brought it up later in the phone call, he responded, "I don't think we did" and "I don't know what you're talking about."

Pattern Jury Instruction § 2.67 (2012). Because the *mens rea* element of § 1512(c) parallels § 1503(a)'s catch-all provision in that it only requires that the defendant acted "corruptly," the jury instruction's definition was permissible. *See United States v. Coppin,* 569 F. App'x 326, 334 (5th Cir. 2014) (per curiam) (holding that "a proper definition" of "corruptly" under 18 U.S.C. § 1512(c)(1) is to act "knowingly and dishonestly, with the specific intent to subvert or undermine the due administration of justice").

Bedoy contends that no rational jury could conclude that he acted with the requisite level of culpability. In support, he points to *United States v. Doss*, 630 F.3d 1181 (9th Cir. 2011). In *Doss*, the Ninth Circuit reversed a witness-tampering conviction under § 1512(b) based on the defendant writing letters to his wife that "encouraged [her] to refuse to testify against him based on their marital status." *Id.* at 1185. In reviewing a sufficiency challenge, the court found that the evidence "established only that [the defendant] appealed to his wife to exercise her marital privilege not to testify against him." *Id.* at 1190. The court held that the defendant's "request, without more, was insufficient to establish 'corrupt' as opposed to innocent persuasion." *Id.* The court also noted that the government did not argue that the defendant "had threatened or intimidated [his wife], which would of course otherwise violate § 1512." *Id.* at 1190 n.6. Bedoy contends that, similar to the defendant in *Doss*, he did not attempt to coerce or intimidate Sysy; he "merely advised" her that she did not have to talk to the FBI.

In contrast to the conviction reversed in *Doss*, a rational jury could conclude that Bedoy did more than innocently advise Sysy of her constitutional rights. Specifically, a rational jury could infer that Bedoy was also instructing Sysy to misrepresent their relationship to conceal any wrongdoing on his part. During the July 11 phone call, he advised: "[I]f someone were ever to ask . . . Hey, if, 'What's your relationship with me?' . . . 'It's someone I've help[ed] 'em

21

with . . . his cases.' That's it." He also stated, "[Y]ou don't ever have to admit you worked" at Studio Serene. Indeed, after telling Sysy not to open the door, he instructed her to lie if she ever got pulled over by police by giving a fake name. The evidence also supports the inference that Bedoy coached Sysy on how to respond to questions about the relationship. For instance, he advanced his theory that she was his informant, as well as denied that they had sex and that he knew she had worked at Studio Serene.

Based on the record, a rational jury could infer that Bedoy was not simply suggesting to Sysy that she exercise her constitutional rights but instead instructing her to lie about the illicit aspects of their relationship if asked. Thus, such evidence was sufficient to prove that Bedoy was acting corruptly.

### 3. The Mazzei Phone Calls

Bedoy argues that the district court reversibly erred when it admitted at trial two recorded telephone conversations between Bedoy and Mazzei made on July 8, 2013. Under the Federal Wiretap Act, to admit these tapes, the Government had to prove that Mazzei consented to recording the phone calls. *See* 18 U.S.C. §§ 2511(2)(c), 2515; *United States v. Gomez*, 900 F.2d 43, 44 (5th Cir. 1990) (observing that the Federal Wiretap Act provides that a recording of an intercepted wire or oral communication is inadmissible absent proof that at least one of the parties to the communication consented). In this case, Special Agent Minor testified that Mazzei made the phone calls at his request and that he observed her consent to the recording. He also testified that Mazzei could see that the call was being recorded and had to physically place the microphone in her ear to record it.

Bedoy argues that the Sixth Amendment's Confrontation Clause was violated when the district court admitted Minor's testimony that Mazzei had said and wrote that she consented to the recording. He also argues that

admitting the tapes was not harmless on Counts One and Two because without those tapes there would be no proof that Bedoy knew of or foresaw a federal grand jury investigation.[3]

Since the Supreme Court's decision in *Crawford v. Washington*, this Court has recognized that "the Confrontation Clause prohibits the admission of an out-of-court testimonial statement unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness." *United States v. Pryor*, 483 F.3d 309, 312 (5th Cir. 2007) (citing *Crawford*, 541 U.S. at 59). "Confrontation Clause objections that were properly raised at trial are reviewed *de novo*, subject to harmless error analysis." *United States v. Acosta*, 475 F.3d 677, 680 (5th Cir. 2007). To hold that a Confrontation Clause violation was harmless, we must "be convinced beyond a reasonable doubt that the error was harmless in light of the other evidence presented at trial." *United States v. Ogba*, 526 F.3d 214, 227 (5th Cir. 2008) (quoting *United States v. Bell*, 367 F.3d 452, 468 (5th Cir. 2004)).

Whether one party has given valid consent under the Federal Wiretap Act is a "preliminary question[] to be determined by the court." *United States v. Gomez*, 947 F.2d 737, 738 (5th Cir. 1991) (per curiam) (citing Fed. R. Evid. 104(a)). We have not, however, addressed whether *Crawford* applies to the court's preliminary determination of a recording's admissibility under the Federal Wiretap Act. Notably, we previously held that *Crawford*'s strictures do not govern the preliminary determination of the admissibility of evidence

---

[3] In so arguing, Bedoy implicitly contends that the tapes would have been inadmissible absent Minor's statements because his other testimony, such as Mazzei having to place a microphone in her ear, would be insufficient to prove consent. However, the Government can usually prove consent "by showing that the informant placed the telephone call knowing that it would be monitored." *United States v. Kolodziej*, 706 F.2d 590, 593 (5th Cir. 1983). Nonetheless, we assume—without deciding—that the tapes would have been inadmissible but for Minor's statement that Mazzei said and wrote she consented.

under Federal Rule of Evidence 104(a). *See United States v. Morgan*, 505 F.3d 332, 339 (5th Cir. 2007). Further, given that the issue of consent is a preliminary determination properly subject to a motion to suppress, *see, e.g.*, *United States v. Wake*, 948 F.2d 1422, 1426 (5th Cir. 1991), out-of-circuit case law suggests that *Crawford* is inapplicable, *see, e.g.*, *United States v. Mitchell-Hunter*, 663 F.3d 45, 51 (1st Cir. 2011) ("There is extensive case law declining to apply the confrontation right to various pre- and post-trial proceedings."); *United States v. Garcia*, 324 F. App'x 705, 708 (10th Cir. 2009).

Yet we need not decide the issue to resolve this case. Even assuming—without deciding—that *Crawford* proscribes Agent Minor's testimony, we find that any error in admitting the tapes was harmless beyond a reasonable doubt. The content of the Mazzei phone calls was cumulative: there was substantial evidence that Bedoy knew of or foresaw a federal grand jury investigation—namely, Bedoy's and Sysy's own statements, which Bedoy concedes were properly admitted. *See, e.g.*, *Pryor*, 483 F.3d at 312 (holding that a Confrontation Clause error was harmless where the government's evidence "was substantial"). After both phone calls with Mazzei, Bedoy called Sysy within minutes to describe the conversation. After Mazzei's second call, he recounted that Mazzei told him that the FBI was looking for Sysy and there was a grand jury investigation. Indeed, Sysy called Bedoy on July 8 to tell him that Mazzei had told her the FBI had spoken to "the girls" and opened a public corruption investigation. Bedoy confirmed that Mazzei "told me the same thing" about the "grand jury." Further, in these phone calls, he not only relayed the contents of what Mazzei said but also described how he responded to them. As he told Sysy, he acted evasively when Mazzei first called, explaining he "just said, 'No, you got [the] wrong number'" and "just hung up on 'em.'" Consequently, we conclude that the admission of the two phone calls—the

24

contents of which Bedoy recounted to Sysy—was harmless error beyond a reasonable doubt.[4]

Accordingly, we affirm both Counts One and Two because the district court did not commit reversible error in admitting the two taped recordings and, as noted, the evidence was legally sufficient.[5]

## C.     Count Three – 18 U.S.C. § 1512(c)(1)

The Government cross appeals the district court's post-verdict judgment of acquittal on Count Three, which charged Bedoy with violating 18 U.S.C. § 1512(c)(1). Specifically, it argues that (1) the district court erred in holding that the indictment was constructively amended and (2) the verdict should be reinstated because the evidence was sufficient to sustain the conviction. Bedoy does not affirmatively dispute the claim that there was no constructive amendment. Rather, he urges that we should affirm the district court on the ground that the evidence was insufficient.

### 1. Constructive Amendment

We review constructive amendment claims de novo. *United States v. Jara-Favela*, 686 F.3d 289, 299 (5th Cir. 2012).

When a grand jury indicts a defendant, "the Fifth Amendment grants the defendant the right to be tried solely on the grand jury's allegations." *Id.*

---

[4] Alternatively, Bedoy objects that the two recordings were inadmissible because the Government failed to prove Mazzei was competent to consent as required by the Federal Wiretap Act. Whether consent was validly given "is a question of fact to be determined from the totality of circumstances." *Gomez*, 947 F.2d at 738. However, we need not address whether the district court's finding of consent was clearly erroneous. Assuming—without deciding—that there was any error, it would be harmless for the same reasons that Bedoy's alleged Confrontation Clause error would be harmless.

[5] Bedoy also contends that his arguments regarding the admission of the tapes "apply equally to Count Three as to Counts One and Two" because Count Three also required the Government to prove knowledge or foresight of a grand jury proceeding. We reject his evidentiary challenge as to Count Three for the same reasons we reject that challenge as to Counts One and Two—namely, assuming without deciding there was any error, it was harmless beyond a reasonable doubt.

No. 15-10438 cons. w/ No. 15-10551

"Only the grand jury may broaden or alter the indictment." *Id.* An indictment is constructively amended in violation of the Fifth Amendment "when the trial court 'through its instructions and facts it permits in evidence, allows proof of an essential element of the crime on an alternative basis provided by the statute but not charged in the indictment.'" *United States v. Phillips*, 477 F.3d 215, 222 (5th Cir. 2007) (quoting *United States v. Slovacek*, 867 F.2d 842, 847 (5th Cir. 1989)). "We 'scrutinize any difference between an indictment and a jury instruction' and 'will reverse only if that difference allows the defendant to be convicted of a separate crime from the one for which he was indicted.'" *Jara-Favela*, 686 F.3d at 300 (quoting *United States v. Nunez*, 180 F.3d 227, 231 (5th Cir. 1999)).

In addition, the prosecution may effect a constructive amendment "even where the court does not formally alter the elements of the offense in the jury charge." *United States v. Doucet*, 994 F.2d 169, 172 (5th Cir. 1993) (emphasis omitted). This occurs, for instance, when the prosecution "change[s] its theory during the trial so as to urge the jury to convict on a basis broader than that charged in the indictment." *Id.*

Here, Count Three of the indictment charged Bedoy with violating 18 U.S.C. § 1512(c)(1) by:

> knowingly and corruptly attempt[ing] to destroy and[6] conceal an object, with the intent to impair its integrity and availability for use in an official proceeding . . . by telling [Sysy] . . . to get rid of her cellular telephone so that there [was] no connection between [her] and Bedoy.

---

[6] In response to a question from the jury during deliberations, the district court explained that the jury could convict if it found that Bedoy attempted to either destroy *or* conceal an object, as provided for in § 1512(c)(1).

Notably, the statute under which he was charged not only criminalizes attempts to "destroy[]" or "conceal[]" a physical object, but also attempts to "alter[]" or "mutilate[]." 18 U.S.C. § 1512(c)(1).

In his post-trial motion, Bedoy argued that he should be acquitted on Count Three because the evidence only proved that he told Sysy to change her phone "by changing the cellular number, not by getting rid of the physical phone itself." Thus, according to Bedoy, there was a constructive amendment because the jury did not find him guilty of attempting to destroy or conceal the phone as charged. Rather, it convicted him under a separate, uncharged basis allowed under § 1512(c)(1)—that prohibiting an individual from "alter[ing]" a physical object.

The district court agreed and vacated his conviction on Count Three. It held there was a constructive amendment because "the jury was permitted to convict [Bedoy] on a factual basis broader than that charged." As it explained, "the Government's evidence was *only* that [Bedoy] told [Sysy] to change her phone number, which is not what the Indictment charged."

On cross appeal, the Government argues that the constructive-amendment claim is effectively a sufficiency-of-the-evidence challenge. It highlights that the district court did not find—and Bedoy did not argue—that the jury instructions were improper or that it urged conviction on an uncharged basis. The district court's sole rationale, it notes, was that no evidence supported the jury's verdict on Count Three.

Bedoy does not rebut the claim that there was no constructive amendment. Instead, he characterizes the constructive-amendment holding as "extraneous" because "[t]he crux of the district court's order dismissing the count was . . . accurate"—the Government failed to prove that Bedoy told Sysy "to get rid of her phone," as charged. Thus, he urges affirmance on the ground that the evidence was insufficient.

27

No. 15-10438 cons. w/ No. 15-10551

We first address the constructive-amendment claim. The court at trial used "many of the curative measures" that "protect against a constructive amendment." *United States v. Comfort Gates*, 624 F. App'x 893, 897 (5th Cir. 2015) (per curiam). Not only was the indictment read to the jurors but also the jury instructions admonished that it was to consider whether Bedoy "is guilty of the crimes charged" and that he was "not on trial for any act, conduct, or offense not alleged in the indictment." *See id.; United States v. Holley*, 23 F.3d 902, 912 (5th Cir. 1994).

In addition, the court's jury charge tracked the language in the indictment. The court instructed the jury that to convict, it must find beyond a reasonable doubt, among other things, that Bedoy "did or attempted to destroy and conceal an object, which in this case the government claims is a cellular telephone" and "acted corruptly by telling Syndia Guerbi to get rid of her cellular telephone so that there would not be a connection between her and the defendant." Neither Bedoy nor the district court suggest that these instructions deviated from the indictment or were otherwise erroneous. Given the presumption that the jury abides by a court's instructions, the charge here suggests that there was no constructive amendment. *See Comfort Gates*, 624 F. App'x at 897.

Further, the Government's conduct did not effect a constructive amendment. Although the court found that the evidence "was only that [Bedoy] told [Sysy] to change her phone number," Bedoy does not argue that the Government urged that Bedoy be convicted on this basis. To the contrary, during its closing statements, the Government argued that the evidence showed that when Bedoy told Sysy to change phones, he meant "a physical item" and that he "want[ed] her to get rid of the phone." As the Government explained, Bedoy "might argue" that he was "just telling her to get a new number. Or even if he tells her to get a new phone, that doesn't mean that he's

telling her to destroy the old phone." It advocated that this interpretation of the evidence was incorrect. Bedoy, it explained, was "trying to make evidence disappear" and "need[ed] her to get rid of the phone," which contained text messages and a call log.

The record does not indicate that either the district court or the Government allowed the jury to convict Bedoy on an uncharged basis generally or under § 1512(c)(1)'s "alter[ing]" clause specifically. Thus, we conclude that there was no constructive amendment of the indictment. However, because embedded in the district court's holding was its conclusion that the evidence did not establish the conduct as charged in the indictment, we address the sufficiency of the evidence on Count Three.

### 2. Sufficiency of the Evidence

Bedoy's sufficiency challenge on Count Three centers on Bedoy's statements to Sysy during their July 14 phone call. During that call, Bedoy said, "You need to change your phone. [W]hat I would do . . . ya know, I would cut everything . . . any tie." He also said, "[Y]ou need to move outta here. And different phone."

Bedoy claims that no rational jury could conclude that his statements—"change your phone" and get a "different phone"—meant "get rid of your phone." He asserts that "[e]ven if [he] meant for Sysy to get a new phone, as opposed to merely a new phone number,[] his words said nothing about what he wanted her to do with the old phone." He also contends that the district court was correct to conclude that the Government's evidence at most showed Bedoy told Sysy to change her phone number rather than the phone itself.

The Government responds that what Bedoy meant when he told Sysy to change her phone or get a different phone was a question of fact that the district court properly sent to the jury to resolve. It asserts that, as it argued at trial, the jury could reasonably infer that Bedoy was "trying to make

evidence disappear." It also claims that other evidence supports the inference that "change your phone" meant "physically dispose of your phone." As it notes, during the July 14 conversation, Bedoy mentioned that he gave his wife his old phone and she "erased everything from [it]," which showed that Bedoy himself had gotten rid of his own phone. In addition, it cites evidence that demonstrates Bedoy's awareness that electronic devices contain data reflecting past communications, specifically, that Bedoy made the July 14 phone call at issue from another person's phone and, several months later, he had the hard drive on his laptop computer erased.

A rational jury could infer beyond a reasonable doubt that Bedoy communicated his intent to Sysy that she get rid of her cell phone. The evidence indicated that Bedoy had a motive for wanting to get rid of the phone, namely, to cover up his relationship with Sysy. Further, he made other statements to Sysy expressing his intent that she needed to cut all her connections and not just those relating to him. During the July 14 phone call, he told her to move, use a different name, and "cut everything" and "any tie." While a verdict cannot be sustained if based "on an overly attenuated piling of inference on inference," *United States v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996), the inferences needed to conclude that he told her to get rid of her phone are reasonable. When Bedoy said to Sysy to "change [her] phone" and get a "different phone"—in the same conversation in which he told her to "cut any ties" and move—a rational jury could conclude that he communicated his intent that she get rid of her old phone.

Accordingly, because the evidence was legally sufficient on Count Three, we vacate the district court's judgment of acquittal and reinstate the jury verdict of guilty on that count.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the conviction on Counts One, Two, and Four, VACATE the district court's judgment of acquittal on Count Three, and REMAND for reinstatement of the jury's guilty verdict on Count Three and for sentencing.