FILED
**United States Court of Appeals**
**Tenth Circuit**

**October 25, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

    No. 16-1229

KENNETH HARDIN,

    Defendant - Appellant.
_____

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 1:14-CR-00449-MSK-1)**
_____

Jeffrey S. Pagliuca of Haddon, Morgan and Foreman, P.C., Denver, Colorado, for
Defendant-Appellant.

James C. Murphy, Assistant United States Attorney (Robert C. Troyer, Acting United
States Attorney, with him on the brief), Denver, Colorado, for Plaintiff-Appellee.

_____

Before **LUCERO**, **McKAY**, and **HARTZ**, Circuit Judges.
_____

**McKAY**, Circuit Judge.
_____

    Defendant Kenneth Hardin was the senior manager of the Civil Rights Division

for the Regional Transportation District in Colorado (RTD). The Civil Rights Division

includes a number of divisions, including the Small Business Office and the Equal

Opportunity Office.  As senior manager, Defendant was responsible for "set[ting] goals on projects for small business participation" and "ensur[ing] compliance of small business participation on various projects."  (R. Vol. IV at 185–86.)  The Division also reviewed all contracts that exceeded $10,000 "to determine if there are small or disadvantaged business opportunity goals applicable to that project."  (*Id*. at 226.)

Lucilious Ward was the owner–operator of a busing company that had been certified as a Disadvantaged Business Enterprise and Small Business Enterprise.  Mr. Ward was also a manufacturing representative for Build Your Dream, a Chinese manufacturer of automobiles and rechargeable batteries.  As a manufacturing representative, Mr. Ward "represented [Build Your Dream] in order to sell their merchandise, electric cars, buses, batteries . . . in the Denver metropolitan area."  (*Id.* at 90.)

In 2008, Mr. Ward's busing company contracted with RTD as a service provider for Access-a-Ride, a program that provides local bus transportation in Denver for people with disabilities.  From that point on, as Mr. Ward would later testify, he paid Defendant monthly bribes in exchange for his help.  When the Access-a-Ride contract expired in 2014 and Mr. Ward received his final check, Defendant called Mr. Ward to request an additional, final payment of $1,100.  His call went to voicemail.

Unbeknownst to Defendant, Mr. Ward had pled guilty to tax evasion.  Hoping to receive a reduced sentence in his tax case, Mr. Ward relayed Defendant's request to the Federal Bureau of Investigation, which began using him as a confidential informant to

investigate Defendant for bribery.  At the direction of the FBI, Mr. Ward met with Defendant several times over a six-month period.  Their conversations were recorded.

On April 30, 2014, Mr. Ward gave Defendant $1,100 for Defendant's help with the Access-a-Ride contract, and the two men began discussing new (illicit) opportunities. As it turned out, RTD was preparing a request for proposal to solicit bids for the purchase of shuttle buses.  At trial, Mr. Ward testified:  "When we first started discussing the buses, RTD was talking about ten buses, purchasing of ten buses.  And ten buses would have been – at $15,000 a bus, would have been roughly around 3 or 400,000.  That's what we were ta[l]king about at first.  And [Defendant's] take was going to be probably about 40 to 80,000 out [of] that, depending on how many buses that RTD purchased from me." (*Id.* at 106.)  At the meeting, Mr. Ward stressed that he "want[ed] to make sure the BYD thing"—i.e., the contract to purchase shuttle busses from Build Your Dream— "goes," (Suppl. R. Exhibit 01 at 17) and said he would "meet" with Defendant "every month [to] continue on with BYD," (*id.*).  Mr. Ward promised "a thousand a month until it comes through," plus "a large sum of money when we get it." (*Id.* at 20.)  Defendant responded, "Well . . . I want you to get the deal." (*Id.*)  Later, Mr. Ward told Defendant that he would "get almost eight-hundred thousand bucks off that deal. . ." (*Id.* at 22.) After referencing past transactions, Mr. Ward stated that he "want[ed] it to continue" and asked Defendant to "make sure it happens for me, man." (*Id.* at 23.)  Defendant responded: "Yeah." (*Id.*)

On May 12, Mr. Ward and Defendant spoke over the telephone.  Mr. Ward called Defendant to discuss RTD's request for proposal for the purchase of shuttle buses.  Mr.

Ward requested that Defendant bring the technical specifications for the shuttle buses RTD would be requesting. Defendant agreed, provided that Mr. Ward "will keep 'em undercover and swear you don't know where you got 'em." (Suppl. R. Exhibit 02 at 6.)

On May 15, Mr. Ward met again with Defendant. Mr. Ward wanted reassurance that Defendant was "on this thing with the RTD." (Suppl. R. Exhibit 03 at 16.) Defendant said, "BYD buses? Yeah." (*Id*. at 17.) Defendant also gave Ward a twenty-nine page document entitled "Mall Bus Technical Specification." Mr. Ward then paid Defendant a bribe of $1,000 cash, "so [Defendant] would continue with the BYD contract." (R. Vol. IV at 131.) To that end, Mr. Ward and Defendant agreed to meet every month to go over the details of the contract to keep Mr. Ward "up to date on where [they] were." (*Id*. at 132.)

Mr. Ward and Defendant met again on June 26 and September 15. Mr. Ward paid $1,000 and $2,000 in cash for continued work on the shuttle-bus contract. During the September 15th meeting, the two men discussed which other companies were likely to bid on the contract. Defendant promised to "get [Mr. Ward] some other information" on potential competitors "in the next couple days." (Suppl. R. Exhibit 06 at 9, 10.) As Mr. Ward said to Defendant, this would allow Mr. Ward and Build Your Dream to "tailor" their proposal. (*Id.* at 12.) Defendant replied: "That would be helpful - that would be helpful." (*Id*.)

In between the two meetings, Defendant and Mr. Ward also spoke by telephone. Defendant promised to "make a few calls and see what's up." (Suppl.. R. Exhibit 05 at 4.) Mr. Ward told Defendant: "Make sure that BYD is still on the table. Make sure

that BYD is going to get buses and we're gonna be able to do what we talked about man." (*Id.* at 5.) Mr. Ward admonished: "[W]e can't make any money . . . , unless[] we sell buses." (*Id*. at 6.) Mr. Ward also reminded Defendant, "none of this is gonna matter unless[] they buy the buses – if they don't buy buses then we ain't gotta talk about all this other stuff. And that's what my deal is with you – is to make sure they freakin' buy buses." (*Id.* at 2.)

Defendant and Mr. Ward had what was to be their final meeting on September 25. Defendant provided a list of three likely competitors' strengths and weaknesses, and discussed those strengths and weaknesses at length with Mr. Ward. At one point, Mr. Ward told Defendant: "I just wanna make sure that . . . that we can get a piece of this, dude. This is too much money to let go." (Suppl. R. Exhibit 07 at 17.) Defendant responded: "Oh . . . this is a great opportunity. This is – this is great." (*Id*.) Later, Defendant promised to keep on RTD, saying he would "wait for the proposals to come in and start talking to them as well." (*Id*. at 20.) Mr. Ward responded, "we can both make some really good money in this," and promised, "[n]ext week, I'll bring you that other thousand." (*Id.* at 23.)

Defendant was indicted on four counts of violating 18 U.S.C. § 666(a)(1)(B) by committing bribery involving a program that receives federal funds. The four counts correlated to the four meetings he had with Mr. Ward about RTD's request for proposal for the shuttle-bus contract. Count 1 charged Defendant with accepting a bribe of $1,100 on April 30, 2014. Although Defendant and Mr. Ward discussed the request for proposal at this meeting, Mr. Ward testified that the bribe was payment for Defendant's help with

- 5 -

the earlier Access-a-Ride contract. The jury acquitted Defendant on this count. However, the jury found Defendant guilty as to Counts 2–4, which were based on Mr. Ward's May 15, June 26, and September 15 bribes relating to the proposed shuttle-bus contract.

After return of the guilty verdicts, Defendant moved for a judgment of acquittal, arguing that, because of his acquittal on Count 1, the government had not shown that the bribes he solicited met the $5,000 threshold set by statute. The government responded that a rational trier of fact could have concluded, based upon all the evidence presented, that the bribes Defendant solicited involved "any thing of value of $5,000 or more." 18 U.S.C. § 666(a)(1)(B). The district court denied Defendant's motion, holding that the jury could reasonably have concluded that the bribes were intended to influence the selection of bids for the shuttle-bus contract and that the value of this contract exceeded $5,000. Defendant timely appealed.

"We review a sufficiency of the evidence challenge de novo, viewing the evidence and the reasonable inferences to be drawn therefrom in the light most favorable to the government." *United States v. Wells*, 843 F.3d 1251, 1253 (10th Cir. 2016). "[O]ur review of the evidence is highly deferential." *United States v. Pickel*, 863 F.3d 1240, 1251 (10th Cir. 2017) (internal quotation marks omitted). "[W]e may neither weigh conflicting evidence nor consider the credibility of witnesses. It is for the jury, as the fact finder, to resolve conflicting testimony, weigh the evidence, and draw inferences from the facts presented." *Wells*, 843 F.3d at 1253. In other words, "[t]he only question is whether the government's evidence, credited as true, suffices to establish the elements of

- 6 -

the crime." *United States v. Johnson*, 821 F.3d 1194, 1201 (10th Cir. 2016) (internal quotation marks omitted). "We may reverse only if no rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Ramos-Arenas*, 596 F.3d 783, 786 (10th Cir. 2010).

Defendant was convicted under 18 U.S.C. § 666, the federal-program bribery statute. A person is guilty under § 666 if he, being an agent of an organization, government, or governmental agency that receives federal-program funds, "corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person, intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more." § 666(a)(1)(B). Defendant's main argument on appeal is that there was insufficient evidence for the jury to find that the bribes were made in connection with any RTD business that involved $5,000 or more.

"The $5,000 element of § 666 pertains to 'the *subject matter* of the bribe,' which 'must be valued at $5,000 or more.'" *United States v. Buenrostro*, 781 F.3d 864, 868 (7th Cir. 2015) (quoting *United States v. Robinson*, 663 F.3d 265, 271 (7th Cir.2011)). "In other words, the 'business' or 'transaction' sought to be influenced must have a value of $5,000 or more." *Id*. (internal quotation marks omitted). "The easiest and most obvious way [to determine the value of the subject matter of the bribe] is by looking at how much someone in the market was willing to pay for the benefit and an official was willing to take to provide the benefit—the value of the bribe." *United States v. Owens*, 697 F.3d 657, 659 (7th Cir. 2012); *see also United States v. Fernandez*, 722 F.3d 1, 12 (1st Cir.

2013) ("In determining how to calculate the $5,000 requirement, some courts have suggested that a court should look to the value of the bribe actually offered or paid."). "This means that the bribe amount 'may suffice as a proxy for value; at least it provides a floor for the valuation question.'" *Id*. (quoting *Robinson*, 663 F.3d at 275). "Another approach to valuing the subject matter of the bribe is by looking to the value of the benefit the bribe-giver will receive if the bribe is successful," *id.*, or to the value of the benefit to third parties "with an immediate interest in the transaction," *United States v. Hines*, 541 F.3d 833, 837 (8th Cir. 2008). Sometimes, it is said that these different ways of appraising the value of the "transaction" or "business" reflect a circuit split. However, our review of these authorities persuades us that they are not in conflict; rather, we conclude that there are various valuation methods that may be applied and that, in evaluating the sufficiency of the evidence to support the jury's verdict, a court should affirm if there is sufficient evidence to support the verdict under any of these methods.

Here, Defendant does not dispute that the shuttle-bus contract itself would be valued at more than $5,000. Instead, Defendant argues that the "subject matter" of the bribe was not the anticipated contract to purchase shuttle buses, but RTD's request for proposal to solicit bids that would eventually lead to such a contract. And he contends that the government failed to introduce evidence that the request for proposal itself had any value, or that any competitive-bidding advantage Mr. Ward received from the information Defendant provided to him was valued at $5,000 or more.

We find this argument to be unavailing because there was sufficient evidence for the jury to find that the "business" or "transaction" at issue was RTD's intended purchase

of shuttle buses, not just the request for proposal. For instance, in the first recorded conversation, Mr. Ward told Defendant that he "need[ed] to get some contracts" and had to "get this BYD thing done," promised Defendant "a thousand a month until it comes through," plus "a large sum of money when we get it," and asked Defendant to "make sure it happens for [him]." (Suppl. R. Exhibit 01 at 18, 8, 20, 23.) Defendant responded that he "want[ed]" Mr. Ward to "get the deal." (*Id.* at 20.) In another conversation, Mr. Ward told Defendant that his "deal" with Defendant was "to make sure [RTD] freakin' buy[s his] buses," and Defendant did not disagree with this characterization of their arrangement. (Suppl. R. Exhibit 05 at 2.) And in their last recorded conversation, Mr. Ward told Defendant that they both had "a lot riding on this," that this was "one of the deals [they'd] been talking about for a long time and bringing . . . it home," that they had to "make sure [they could] get to the right people and do what [they] need[ed] to do" to get the deal, that this was "too much money to let go," and that, if they could "get this deal," they could "split a lot of money . . . hundreds of thousands of dollars." (Suppl. R. Exhibit 07 at 10, 17, 23.) Taking all of the evidence in the light most favorable to the government, a rational trier of fact could reasonably find that Mr. Ward paid for Defendant's help with respect to the lucrative shuttle-bus-purchase contract, and not just with respect to the request for proposal that was a preliminary step in RTD's intended transaction.

We are also unpersuaded by Defendant's related argument that § 666, as applied to him in this case, is impermissibly vague. This argument is premised on Defendant's underlying contention that the subject matter of the bribe was the request for proposal,

not the contract, and, as discussed above, we conclude that the jury could reasonably find the subject matter of the bribe to be the shuttle-bus contract itself. And we are persuaded that the statute was sufficiently definite to give Defendant fair notice of the criminality of his conduct. *Cf. United States v. Graham*, 305 F.3d 1094, 1105 (10th Cir. 2002) (rejecting a void-for-vagueness challenge to a conviction for "engag[ing] in the business of . . . dealing in explosive materials" because, "[c]ontrary to [the defendant's] suggestions on appeal, the fact that there may be variations in the ordinary meaning to the term 'business' does not render the term vague for constitutional purposes").

We accordingly **AFFIRM** Defendant's conviction and sentence.