# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 5, 2021

Lyle W. Cayce
Clerk

No. 19-20697

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

RODOLFO RUDY DELGADO,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:18-CR-115-1

Before DENNIS, HIGGINSON, and WILLETT, *Circuit Judges*.
STEPHEN A. HIGGINSON, *Circuit Judge*:

Appellant Rodolfo Rudy Delgado was convicted by a jury of numerous bribery-related offenses carried out in connection with his duties as a judge on the 93rd Judicial District in Hidalgo County, Texas.

The case the Government presented at trial was relatively straightforward and involved two main players: Delgado and an attorney named Noe Perez. The jury found that over the course of a decade, Perez would routinely bribe Delgado in order to secure Personal Recognizance

("PR") bonds for his clients who had pending criminal matters before Delgado, when Delgado still presided as a judge.

The scheme purportedly began back in 2008, when Delgado received from Perez a pickup truck valued at $15,000. The truck incident, however, remains an outlier. Rather, the crux of the scheme involved a familiar pattern. Perez would drive to Delgado's house on the pretense of purchasing firewood from Delgado. Once there, Perez would discuss one of his clients who was appearing before Delgado and express hope that Delgado would release that client on a PR bond instead of holding him for detention or releasing him on a monetary bond.[1] Perez would then pay Delgado an inflated amount of cash for a bundle of firewood and Delgado would invariably release Perez's client on a PR bond.

Perez eventually came to the attention of the FBI for separate acts of possible corruption unrelated to Delgado, but soon the FBI began investigating Delgado with Perez as a cooperating informant. The FBI had Perez wear a wire and offer payments to Delgado on multiple occasions. The Government further offered proof that Delgado eventually became aware of the investigation and tried to interfere with it.

After considering the evidence presented at trial, the jury convicted Delgado on eight felony counts: conspiracy under 18 U.S.C. § 371 to commit federal program bribery in violation of 18 U.S.C. § 666(a)(1)(B) (Count One); federal program bribery in violation of 18 U.S.C. § 666(a)(1)(B) (Counts Two, Three, and Four); use of a facility in interstate commerce in aid of a racketeering enterprise in violation of 18 U.S.C. § 1952(a)(3) (Counts Five,

---

[1] While the PR bonds did not require Perez's clients to put up any money in order to secure their release, the bonds conditionally required the clients to forfeit a sum of money—typically $5,000—should they fail to appear or violate other conditions of their release.

No. 19-20697

Six, and Seven); and obstruction of justice in violation of 18 U.S.C. § 1512(c)(2) (Count Eight).

The district court sentenced Delgado to 48 months' imprisonment on Counts One, Five, Six, and Seven, and 60 months' imprisonment on Counts Two, Three, Four, and Eight—with both sentences to be served concurrently—followed by two years of supervised release.

On appeal, Delgado challenges the sufficiency of the evidence supporting each conviction. He also appeals his sentence on the ground that the district court improperly applied a six-level enhancement under U.S.S.G. § 2C1.1(b)(2) due to an incorrect calculation of the total "benefit received" in exchange for the bribes. We AFFIRM.

I

For over 16 years and up until the time of his arrest, Delgado served as a state judge in the 93rd Judicial District Court in Hidalgo County, Texas, presiding over criminal and civil cases.

Perez became an attorney in 2002, after having previously worked as a probation officer. After graduating from law school, Perez worked for a year at the law firm of Guerra and Moore (run by Carlos Guerra and Michael Moore) in McAllen, Texas. He then opened a solo practice performing criminal defense work (among other services), including in the 93rd Judicial District where Delgado presided. Carlos Guerra, Perez's former boss and a friend of Delgado's, introduced Perez to Delgado.

In November 2008, Perez was representing Edylfonso Montano, who faced a probation revocation hearing in front of Delgado. Perez charged a $15,000 fee for the case. In lieu of cash, Montano paid the fee by giving Perez a used pickup truck. Unsure if he could accept a truck as payment, Perez reached out to Carlos Guerra for advice. Guerra advised that accepting the

3

No. 19-20697

truck was permissible and asked which judge Perez was appearing before on the matter. When Perez told Guerra that he was appearing before Delgado, Guerra informed Perez that he would call him back shortly.

Instead, Perez received a call from Delgado. Delgado asked Perez to meet him at a bar to discuss the truck. At the bar, Delgado instructed Perez to meet him the next day with the truck at Panther Motors, a dealership in town. The Government asked Perez on direct examination if he had discussed any of his clients with Delgado while at the bar, and Perez answered: "Well, it wasn't very much on the – on the client, it was more about the truck . . . ."

When the two met the next day at Panther Motors, Perez handed over the title to the truck to Delgado, who went inside while Perez waited in Delgado's car. Delgado then dropped off Perez at Perez's house.

Delgado never paid Perez for the truck. Records listed Montano as having sold the truck to Ignacio Ruiz, a close friend of Delgado and the owner of Panther Motors, on November 4, 2008. However, Montano was not present at Panther Motors that day, and had never been to Panther Motors. He never signed the title to Panther Motors or Ruiz, and Panther Motors had no records showing they paid Montano for the truck. Title to the truck was ultimately registered to Delgado's son.

When Perez later tried to discuss the truck with Delgado, Delgado would move the conversation to other topics. When asked by the Government on direct examination what he got in exchange for the truck, Perez stated: "I guess access to [Delgado] . . . I would ask for – for things and it – you know, things would be granted." Delgado continued Montano's probation revocation hearing numerous times over the next four years, until it was eventually dismissed by another judge upon motion by the State.

4

In November 2016, the FBI received a tip from the spouse of one of Perez's clients. The spouse claimed that Perez had told the client that he had bribed a judge for a favorable ruling. The FBI had the spouse meet with Perez, while wearing a wire. At the meeting, Perez told the spouse that some of the client's fee would go to bribing the judge in the case. The judge in that case was not Judge Delgado, but a different judge.

The FBI then interviewed Perez. According to FBI Special Agent David Roncska, Perez admitted during that interview that he had been bribing Judge Delgado for several years in order to secure favorable rulings for his clients. In response to the FBI's questions about paying bribes to Delgado, Perez described that he would "purchase wood" from Delgado.

At trial, Perez explained on direct examination what he meant by "purchasing wood" in the timeframe prior to the FBI's investigation:

> Q: Prior to the [FBI] investigation, did you go to Judge Delgado's home and give him money for things?
>
> Perez: Yes . . . I would kind of like disguise it in like buying wood and, you know, give him – I said I'm going to buy some wood and give him $250, 300 bucks, 250, 260.

Perez described that he would pay about $250 for 12 to 20 pieces of wood, which would normally cost about $30 or $40 at a local store. He explained that paying such prices was "beneficial" for him because his clients would "probably" receive a "favorable discretion or ruling." Specifically, whenever Perez went to Delgado's home to purchase wood, the two would always discuss Perez's cases and Perez would ask Delgado if he would consider releasing his clients on PR bonds. Perez would also sometimes pick up beer for Delgado, slipping $250 in cash into the beer box.

At the FBI's request, Perez provided a list of his clients on whose behalf he had bribed Delgado for favorable outcomes. The list included four

names. The Government introduced records at trial showing that those four individuals had received favorable rulings from Delgado, including PR bonds, between 2014 and 2016.

Perez then began cooperating with the FBI, which asked him to set up meetings with Delgado in order to gather further evidence.

In December 2016, the FBI instructed Perez to set up a meeting with Delgado. The FBI gave Perez $260 to bribe Delgado, and told Perez that his client, Raul Sanchez, was in jail and had a motion to revoke probation pending in Delgado's court. Perez called Delgado to set up a meeting with him at Delgado's house.

On December 13, 2016, Perez went to Delgado's house wearing a wire. Perez told Delgado that he had a client "sitting in jail" on a motion to revoke. He then asks Delgado: "You think we could do a little wood?" Delgado responds: "Oh yeah . . . A lot of wood once we get to some fact finding."

Perez and Delgado then engage in a back and forth about Raul Sanchez. Perez informs Delgado that he will be out of town on Sanchez's hearing date and needs to resolve it sooner. Delgado replies that he cannot pick Sanchez "out of the herd and say let me do magic over here. That could lead people to wonder and I don't want people wondering."

After the conversation digresses into a discussion of Perez's and Delgado's personal lives, Perez returns to the issue of Sanchez and asks Delgado to "see if we can get him out." Delgado responds: "I'm going to help you out . . . [b]ut it's how to do it and-and—and you [sic] how to do it right. Cause I can't just be having these thoughts in the middle of the night about picking a critter out of the litter . . . somebody can go[:] How'd that happened."

Perez then tells Delgado: "Let me pay for that wood now and then I come back maybe next week and get it." He then pays Perez the $260 dollars

given to him by the FBI. Two days after the meeting, on December 15, 2016, Delgado signed an order releasing Raul Sanchez on a PR bond of $5,000.

In August 2017, the FBI used Perez to set up another attempt at a sting on Delgado. This time, the FBI wished to mimic the circumstances of the 2008 pickup truck incident. Delgado had recently issued a warrant for the arrest of Santos Maldonado, "who had ran a bond on his case." The FBI told Perez that Maldonado would be his client, and that Perez should approach Delgado about securing Maldonado's release on a PR bond. But instead of bribing Delgado with money, Perez was to explain that Maldonado had promised him a 2010 BMW as payment.

Perez, again wearing a wire, met Delgado at Delgado's house and explained that Maldonado was arrested while transporting 300 kilograms of cocaine. He then describes that the "feds did not take it," referring to Maldonado's case. Immediately, Delgado starts saying: "Ding, ding, ding, ding, ding, ding . . . ." After confirming that the case is being prosecuted by the state, rather than the federal government, Delgado implies that the federal government is trying to set up someone. Delgado then explains to Perez why he thinks the federal government would decline to prosecute a case like Maldonado's: "'Cause they want that skunk to go up the state system which is, in their view, fucking corrupt. From the J-Ps to the lawyers, to the D-A, to the judges at the courthouse." Delgado further states to Perez: "[Y]ou're talking about slam dunk fucking cases that they're rejecting and that's 'cause they want to see what I'm doing and what Rick Rod's doing and what we're doing, yeah."

When Perez tells Delgado that he will text him to remind him about Maldonado's case, Delgado says: "[N]o, no, no we don't want to do that." Delgado tells Perez to call Delgado's assistant and to ask her to have Delgado review Maldonado's case, because "that's just regular lawyer-like business,"

and "better than you sending me a text." Delgado does not accept any payment with respect to Maldonado.

In November 2017, Perez set up another meeting with Delgado with plans to pay him $260 in FBI-supplied money to secure a client's release on a PR bond. The client, Lucio Leija, had a motion to revoke probation pending in front of Delgado.

Perez picked up Delgado in his car and the two drove around while discussing Leija's case. The exchange was captured by a wire recording and a video camera inside Perez's car. Perez hands a copy of Leija's motion to revoke to Delgado for his review. Delgado notes that Leija is facing ten years imprisonment on the pending charges and observes that Leija has committed various violations of probation conditions. Delgado then states: "So if I wanted him to go to the penitentiary he's obviously fucked."

Perez asks: "So you think we can do something . . . for [Leija]?" Delgado eventually replies: "so yes I can help . . . I can help. All he's got to do is plead true." Perez then gives Delgado beer and the $260 that the FBI had supplied him with. Delgado states: "I'll take care of you and I'll give him a chance." On December 5, 2017, Delgado released Leija on a $5,000 PR bond.

On January 17, 2018, again at the behest of the FBI, Perez arranged another meeting with Delgado to discuss a client, Jose Garza, who had a motion to revoke probation pending before Delgado.

The meeting was scheduled to take place at a restaurant, and when Perez arrived Delgado texted him to come inside the restaurant. Perez responded that he had "something for you don't want to give it in the restaurant can you come outside won't take long." Delgado walked outside and got into Perez's car.

Perez had with him $5,500 in cash inside a roughly one-inch thick envelope. Perez explained to Delgado that "I have this guy uh that needs a little help on. I charged him a pretty good chunk of change . . . I got $5,500 for you, you know um but it's just a motion to revoke." Perez expresses hope that Garza could "maybe get a bond or something tomorrow." Perez then passes the envelope containing $5,500 in cash to Delgado.

Delgado tells Perez that he would "bring it up tomorrow" and asks Perez to write down the case number on a post-it note. Perez wrote down his name, Jose Garza's name, and the case number. After discussing hunting for a moment, Perez tells Delgado that he would drop by court the next day "just to see if you can get that order out you know." Delgado replied: "Yeah sounds good." The next day, on January 18, 2018, Delgado released Jose Garza on a $5,000 PR bond.

On January 5, 2018, a blog entry was posted on the website anonymousrgv.com speculating that a judge in Hidalgo County had been indicted for bribery. Around the same time, an attorney in McAllen named Ernie Aliseda told Roberto Guerra (a Texas State Representative and attorney) that there was a federal investigation into Delgado for "something to do with the sale of wood."

A couple of days after the conversation with Aliseda, Roberto Guerra called Juan Hinojosa (a Texas State Senator and attorney) to tell him about the investigation. Guerra told Hinojosa that he wondered if the investigation had something to do with a "mesh case" or "with selling firewood for inflated prices."

On January 25, 2018, now aware of the possible investigation, Hinojosa texted Delgado to ask if he was "available for drinks." The two initially met at a restaurant, but then went to Carlos Guerra's house (no known relation to Roberto Guerra). There, Hinojosa informed Delgado of his

conversation with Roberto Guerra: that he had heard that Delgado "was being investigated by the FBI for selling overpriced firewood . . . [or] the mesh case." Hinojosa also told Delgado (according to the testimony of Carlos Guerra) that Hinojosa knew "an investigator on the inside" who had told him that "there [was] an investigation." Delgado, upon receiving this news, "was very defiant" and "angry." He acknowledged having previously seen the blog post speculating about an investigation but dismissed it as "a bunch of BS."

On January 29, 2018, Roberto Guerra appeared in court before Delgado on behalf of a client. After the hearing, Delgado requested that Guerra accompany Delgado to his chambers. There, Delgado explained to Guerra that he had heard from Hinojosa that there was an investigation into Delgado for something involving the "sale of wood." Guerra was apparently taken aback—he "just froze"—and then told Delgado that he "had no idea" what those rumors meant before quickly exiting his chambers.

Later that same day, during the evening of January 29, 2018, Delgado sent Perez a text message regarding the January 17, 2018, $5,500 cash payment. The text message read:

> Good evening, please call me. The campaign contribution needs to be by check. I need to return that to you so you can write a check. Sorry about the confusion, I thought you knew and I did not open the envelope till today.

Four days later, the FBI arrested Delgado. The FBI searched Delgado's judicial chambers and discovered the post-it note that Perez gave to Delgado with his name and Jose Garza's name and case number.

Delgado's trial lasted six days and the Government presented six witnesses: Noe Perez, Roberto Guerra, Juan Hinojosa, Carlos Guerra, Edylfonso Montano, and FBI Special Agent David Roncska. Perez was the

main witness and provided the bulk of the testimony about his dealings with Delgado. Agent Roncska discussed the FBI's investigation into Delgado (including Perez's involvement) and the audio and video tapes from the sting operations. Montano provided limited testimony about the 2008 pickup truck; notably, that he paid Perez with the truck and never signed the title to anyone at Panther Motors. Roberto Guerra, Hinojosa, and Carlos Guerra testified regarding their conversations with Delgado about his awareness of the FBI investigation.

The Government submitted numerous exhibits. The jury listened and watched audio tapes and video tapes of Delgado accepting payments from Perez. The jury also listened to Perez's phone calls and viewed his text messages. The jury reviewed the case files of Perez's clients, including the PR bonds that Delgado issued, and the documents involving the truck Delgado received from Perez.

Delgado moved for judgment of acquittal after the close of the Government's case in chief. He argued that there was "not evidence of an understanding, an agreement" between him and Perez, but rather that Perez's own testimony made it clear that Perez merely "hoped for" favorable outcomes for his clients and "that was the reason he would buy wood from time to time." He also argued that there was no evidence that he was aware of the federal grand jury investigation into his conduct. The district court reserved its decision.

The defense presented three witnesses: Delgado's wife Diana Delgado, Delgado's court reporter Jacqueline Inks, and McAllen attorney Ray Thomas. Inks testified about her duties as court reporter and that on January 29, 2018, and again on the 30th, she emailed Delgado transcripts from the mesh case he presided over. Thomas testified that in January 2018, Delgado sought his legal advice and he recommended a defense attorney to

Delgado. Diana Delgado testified that she and Delgado purchased the truck, which contradicted Perez and Montano's testimony and Panther Motor's financial records.

Before the jury returned its verdict, the district court denied Delgado's pending motions for acquittal. The jury then returned its verdict finding Delgado guilty on all counts. Ten days after the jury verdict, Delgado filed a motion for judgment of acquittal notwithstanding the verdict. The district court denied the motion.

In advance of sentencing, a probation officer prepared a Presentence Investigation Report ("PSR") which calculated the total value of the benefits received in return for the bribe payments to be $45,500. *See* U.S.S.G. §§ 2C1.1(b)(2), 2B1.1(b). This total included $15,000 based on the value of the pickup truck with the remainder derived from the sum total of the PR bond amounts awarded by Delgado to Perez's clients in connection with the bribe payments (e.g., $5,000 for the PR bond awarded to Raul Sanchez in connection with the December 2016 sting).[2] The PSR calculated a total offense level of 28, which included a six-level enhancement under U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b) because the value of the "benefit received" exceeded $40,000 but was less than $95,000.

Delgado filed objections to the PSR, including the six-level enhancement, which the district court overruled. Based on an offense level of 28 and advisory Guidelines range of 78–97 months, the district court sentenced Delgado to concurrent terms of 48 months' and 60 months' imprisonment, followed by two years of supervised release.

---

[2] Additionally, $500 of the total was attributable to two of Perez's clients whom Perez claimed received "favorable rulings" as a result of payments he made to Delgado in 2016, prior to his involvement in the FBI investigation.

No. 19-20697

## II

We begin by considering Delgado's challenge to the sufficiency of the evidence supporting each conviction:

> Where, as here, a defendant has timely moved for a judgment of acquittal, this court reviews challenges to the sufficiency of the evidence *de novo*. Though *de novo*, this review is nevertheless highly deferential to the verdict. Because of the shortcomings inherent in examining a cold appellate record without the benefit of the dramatic insights gained from watching the trial, we review the evidence and all reasonable inferences in the light most favorable to the prosecution and to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*United States v. Nicholson*, 961 F.3d 328, 338 (5th Cir. 2020) (internal quotation marks and citations omitted).

We first address Delgado's convictions for federal program bribery (Counts Two through Four) before turning to his conspiracy conviction (Count One). We then consider the racketeering convictions (Counts Five through Seven) and the obstruction of justice conviction (Count Eight).

## A

On Counts Two through Four, the jury convicted Delgado of federal program bribery in violation of 18 U.S.C. § 666(a)(1)(B). Under that section, it is unlawful when any agent of a state government that receives more than $10,000 from any federal program:[3]

> corruptly solicits or demands for the benefit of any person, or accepts or agrees to accept, anything of value from any person,

---

[3] Delgado stipulated that he qualifies as a state agent within the meaning of the statute.

No. 19-20697

intending to be influenced or rewarded in connection with any business, transaction, or series of transactions of such organization, government, or agency involving any thing of value of $5,000 or more.

18 U.S.C. § 666(a)(1)(B).

Each of Counts Two, Three, and Four is based on the separate successful stings conducted by the FBI after Perez began cooperating as an informant. Count Two corresponds with the December 2016 sting, where Perez paid Delgado $260 in order to secure the release of Raul Sanchez on a $5,000 PR bond. Count Three corresponds with the November 2017 sting, where Perez paid Delgado another $260 to secure the release of Lucio Leija on a $5,000 PR bond. Count Four corresponds with the January 2018 sting, where Perez paid Delgado $5,500 in cash outside the restaurant to secure the release of Jose Garza on a $5,000 PR bond.

As an initial matter, Delgado raises an identical challenge to Counts Two and Three on the ground that the evidence was insufficient to establish the $5,000 minimum transactional value element for each offense under § 666(a)(1)(B). Specifically, he argues that the jury lacked sufficient evidence to conclude that the PR bonds awarded by Delgado to Perez's clients had a value of at least $5,000. In support of his argument, Delgado relies on our decision in *United States v. Marmolejo*, 89 F.3d 1185 (5th Cir. 1996), for the proposition that it is the bribe amount—roughly $250 for each PR bond here—that exclusively constitutes the valuation of transactions under § 666(a)(1)(B). We reject this reading of *Marmolejo*.

In *Marmolejo*, the sheriff of Hidalgo County was convicted of federal program bribery under § 666(a)(1)(B) for accepting bribes in exchange for permitting a prisoner to receive conjugal visits at the Hidalgo County jail. 89 F.3d at 1188. In affirming the conviction, this court first held that the term

14

"anything of value" in § 666(a)(1)(B) includes "transactions involving intangible items" such as the conjugal visits in that case. *Id.* at 1191.

Next, we considered whether the transaction involving the conjugal visits reached the $5,000 threshold. We described that "[t]o decide whether a transaction involving intangibles has a value of $5,000 or more, courts should look to traditional valuation methods." *Id.* at 1194. Holding that the transaction involving the conjugal visits exceeded $5,000 in value, we explained that "[w]e arrive[d] at this estimate in the same way that an appraiser would value an asset—by looking at how much a person in the market would be willing to pay for them." *Id.* Because the prisoner "was willing to pay [the sheriff] $6,000 a month plus $1,000 for each visit," the transaction "involved something 'of value of $5,000 or more.'" *Id.*

To be sure, the bribe amount was probative of the transaction value under the facts of *Marmolejo*. But there is no rule that the bribe amount is always dispositive of the value of a bribery transaction under § 666(a)(1)(B). Indeed, in *Marmolejo* we instructed courts to look to "traditional valuation *methods*"—using the plural—rather than bind them to a single, inflexible method of looking solely at the bribe amount. Our subsequent cases have similarly construed *Marmolejo* as articulating one possible method of calculating value. *See, e.g.*, *United States v. Richard*, 775 F.3d 287, 294 (5th Cir. 2014) ("[I]n *United States v. Marmolejo* we held that the value of § 666's transactional element *may* be satisfied by looking to the amount of the bribe . . . . Thus, because the amount of the bribe here was $5,000, the jury reasonably *could* have concluded that the transactional element was satisfied." (emphasis added)).

This is because the utility of looking to the bribe amount will vary depending on the circumstances of the transaction. For example, if we want to ascertain the market value of a "thing of value" exchanged in connection

with a bribe (which is one possible method of assessing value), the bribe amount may sometimes significantly diverge from what that thing of value might fetch in the open market. Imagine a computer costs $1,000 if purchased from an online retailer, but a government IT worker can purchase the same computer for $500 using her government discount. If someone bribes the worker with $100 in order to acquire the computer (the "thing of value") at the discounted price, the open market value of the computer is still $1,000, even though the bribe amount is $100.[4]

Looking to our sister circuits' treatment of § 666(a), we find multiple valuation methods in use. As this court has done, other circuits have held that the bribe amount is a potentially useful (if non-exclusive) proxy. *See, e.g.*, *United States v. Owens*, 697 F.3d 657, 659 (7th Cir. 2012) ("[T]he bribe amount 'may suffice as a proxy for value; at least it provides a floor for the valuation question.'" (quoting *United States v. Robinson*, 663 F.3d 265, 275 (7th Cir. 2011))); *United States v. Fernandez*, 722 F.3d 1, 13 (1st Cir. 2013) ("[T]he value of the bribe may be relevant in determining the value of the bribe's objective."); *United States v. Townsend*, 630 F.3d 1003, 1012 (11th Cir. 2011) ("We agree that the market approach is a valid method for determining the value of an intangible obtained through bribery."). But some circuit courts also look to "the value of the benefit the bribe-giver will receive if the bribe is successful," *Owens*, 697 F.3d at 659, or to "the value of the benefit to third parties 'with an immediate interest in the transaction,'" *United*

---

[4] Alternatively, one could argue that the subject matter of the bribe in this example is the $500 government discount, rather than the computer itself. Regardless, the point remains that the value of the thing exchanged will not always equate to the bribe amount.

*States v. Hardin*, 874 F.3d 672, 676 (10th Cir. 2017) (quoting *United States v. Hines*, 541 F.3d 883, 837 (8th Cir. 2008)).[5]

We agree that these alternative approaches "are not in conflict" with one another and, generally, that "in evaluating the sufficiency of the evidence to support the jury's verdict, a court should affirm if there is sufficient evidence to support the verdict under any of these methods." *Hardin*, 874 F.3d at 676.

Here, rather than looking to the bribe amount, the trial evidence focused on the value of the PR bonds to Perez's clients, who certainly qualify as interested third parties to the transactions between Delgado and Perez. The Government notes that "[i]t is difficult to place a price on the clients' freedom and the financial benefits they received by returning to their professional (and personal) lives [as a result of the PR bonds]," but that Delgado effectively acknowledged the benefit to be worth at least $5,000 by setting that amount as the face value of the bonds. Delgado objects to that valuation, arguing that none of the clients was actually required to put down a cash deposit in order to secure their release.

It is true that the "face value" of the PR bonds awarded by Delgado represents only the amount that the clients would be required to forfeit should they violate the terms of their release, such as by failing to appear in court. Nonetheless, a rational juror could conclude that an individual who was willing to risk forfeiting $5,000 in order to secure a PR bond valued the

---

[5] Looking at the value of the benefit that a bribe-payor or interested third party attains from a transaction may be especially probative when the subject matter of the bribe is insulated from open market forces that more reliably and consistently set value. In such cases, while the bribe amount may accurately set a valuation "floor," there may be reasons to believe that the bribe amount significantly underappreciates the actual value of the transaction.

No. 19-20697

benefit of that bond (the "thing of value") to be at least $5,000. And to the extent the jury also considered the value of difficult-to-quantify benefits such as the clients' liberty interests, that is precisely where the wisdom of the jury is most useful and where courts should be reluctant to step in on review.

In sum, we hold that there was sufficient evidence for the jury to conclude that the transactional element of § 666(a)(1)(B) was satisfied with respect to Counts Two and Three.[6] We now address the remainder of the evidence with respect to each count.

As described above, the December 2016 sting where Perez "purchased wood" from Delgado for $260 in order to secure a PR bond for Raul Sanchez forms the basis of Count Two. Delgado argues that the evidence presented at trial was insufficient to show an "explicit" agreement between Delgado and Perez to exchange money for an official act.[7] In making this argument, Delgado mainly points to portions of Perez's testimony on cross-examination where Perez purportedly denies that he bribed Delgado, denies there was a quid pro quo, and characterizes the wood payments as

---

[6] Delgado makes no argument on appeal that the jury was misinstructed as to the term "value" or that he was limited in any way on this point in making his closing argument.

[7] In his briefing, Delgado repeatedly refers to what he purports to be the "explicitness requirement" of § 666(a)(1)(B), citing as his sole legal authority the Ninth Circuit's decision in *United States v. Carpenter*, 961 F.2d 824 (9th Cir. 1992). However, *Carpenter* did not involve § 666; rather, it concerned "official right" extortion under the Hobbs Act. *Id.* at 825. Regardless, while the Ninth Circuit required "the quid pro quo [to] be clear and unambiguous" with respect to Hobbs Act extortion, it also described that the "understanding need not be verbally explicit." *Id.* at 827. The court explained that to require an official to "specifically state[] that he will exchange official action for a contribution . . . would allow officials to escape liability under the Hobbs Act with winks and nods . . . ." *Id.*

legitimate purchases of wood that were merely accompanied by Perez's independent "hope" that Delgado would rule favorably for him.

It is true that, to some extent, Perez was an inconsistent witness and that he sometimes minimized culpability during his testimony. But the jury was in a position to assess the credibility of Perez's conflicting statements in light of the totality of the evidence and was free to conclude that Delgado agreed to accept money from Perez with the intent to be influenced in his decision to secure favorable outcomes for Perez's clients.

As described in detail above, Perez testified extensively on direct examination about how he would buy wood from Delgado at inflated prices with the aim of securing favorable outcomes for his clients. And during the December 2016 meeting with Delgado, Perez was wearing a wire that recorded him asking Delgado "[y]ou think we could do a little wood?" right before engaging in a back and forth about the circumstances of Raul Sanchez's pending motion to revoke. Delgado tells Perez that he is "going to help [Perez] out" but that they need "to do it right" because he "do[esn't] want people wondering." Perez then pays him $260 for "wood" and two days later Sanchez is released on a PR bond. A rational juror could conclude that this was bribery.

Delgado's nearly identical challenge to his conviction under Count Three similarly fails. The November 2017 sting involving Perez's client Lucio Leija and his pending motion to revoke played out in similar fashion to the December 2016 sting. A rational juror could again conclude that this was another instance of bribery.

Count Four was premised on the January 2018 sting where Perez paid Delgado $5,500 in cash after discussing Perez's client Joe Garza. Delgado repeats his same argument about Perez's testimony and the lack of an explicit agreement, but also argues that the evidence shows that Delgado met Perez

with the expectation that he would be receiving a legitimate campaign contribution rather than a bribe. As with Counts Two and Three, there was more than sufficient evidence for a rational juror to conclude that the $5,500 cash payment was a bribe and that Delgado accepted the payment intending to be influenced in his decision to grant Garza a PR bond. For example, after accepting a roughly one-inch thick envelope full of cash, Delgado asks Perez to write down Garza's case information, and the very next day Delgado releases Garza on a PR bond. A rational juror could conclude those actions were connected.

In sum, there was sufficient evidence supporting the jury's convictions on Counts Two, Three, and Four.

B

Count One alleged that Delgado had conspired, per 18 U.S.C. § 371, to commit federal program bribery in violation of 18 U.S.C. § 666(a)(1)(B). The conspiracy allegedly began in November 2008 with the truck incident and lasted until November 2016 when Perez became involved in the FBI investigation. The conspiracy timeline halts once Perez becomes a government informant because "there can be no conspiracy between one defendant and a government informer." *United States v. Reyes*, 239 F.3d 722, 738 (5th Cir. 2001) (quoting *United States v. Manotas-Mejia*, 824 F.2d 360, 365 (5th Cir. 1987)).

Conviction for conspiracy under § 371 requires proof of "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Richard*, 775 F.3d 287, 294 (5th Cir. 2014) (quoting *United States v. Coleman*, 609 F.3d 699, 704 (5th Cir. 2010)).

"To be a conspiracy, an express, explicit agreement is not required; a tacit agreement is enough." *United States v. Shoemaker*, 746 F.3d 614, 623 (5th Cir. 2014) (quoting *United States v. Westbrook*, 119 F.3d 1176, 1189 (5th Cir. 1997)). "A conspiracy may be proven with only circumstantial evidence or 'inferred from a concert of action.'" *Id.* (quoting *United States v. Virgen-Moreno*, 265 F.3d 276, 284–85 (5th Cir. 2001)). And a conspiracy "conviction may be based even on uncorroborated testimony of an accomplice or of someone making a plea bargain with the government, provided that the testimony is not incredible or otherwise insubstantial on its face." *Id.* (quoting *United States v. Osum*, 943 F.2d 1394, 1405 (5th Cir. 1991)).

Beginning with the 2008 pickup truck incident, Delgado argues that the evidence put forth by the Government is insufficient to show an agreement between Delgado and Perez to commit bribery. We agree that the truck incident does not support the conspiracy conviction.

To be sure, there is more than sufficient evidence to conclude that Delgado was up to no good when it comes to the truck incident. But, unlike the "buying wood" incidents, the Government has identified no evidence in the record showing that Delgado and Perez discussed any actions to be taken with respect to any of Perez's clients (or any other official action that would benefit Perez) when Delgado acquired the truck. The Government asked Perez if he and Delgado discussed any clients when they met at the bar to discuss the truck. Perez responded: "Well, it wasn't very much on the – on the client, it was more about the truck . . . ." Perez also testified that whenever he later tried to bring up the truck with Delgado, Delgado would quickly change topics. And while Montano (the client who supplied Perez with the truck) had a pending motion to revoke before Delgado at the time, that motion was not resolved until four years later when the prosecution moved to withdraw it. Notably, before sending the third superseding indictment back to the jury for use during its deliberations, the district court redacted the

reference to the truck incident as an overt act of the conspiracy. In its view, there was no evidence that Delgado took the truck "in exchange for favorable consideration on the case involving [Montano]."

But even if the 2008 truck incident is not enough in isolation, the evidence about the pre-November 2016 "buying wood" incidents provides sufficient evidence of an agreement for a conspiracy to commit federal program bribery within the timeframe of Count One. As described above, Perez testified on direct that during the timeframe of the alleged conspiracy, Perez would meet at Delgado's home to buy firewood at inflated prices and request favorable outcomes on behalf of his clients. He also provided a list of clients who he claimed received favorable outcomes as a result of the bribes, including PR bonds with face values of $5,000 and $10,000. Given that a conspiracy conviction can be based on the uncorroborated testimony of an accomplice, *Shoemaker*, 746 F.3d at 623, this evidence is sufficient to support a conviction for conspiracy.[8]

Delgado argues that the evidence related to the "buying wood" incidents does not show an agreement, again citing to general inconsistencies in Perez's testimony. For the same reasons discussed above with respect to Counts Two through Four, that argument is unavailing. He also makes his same argument about the lack of evidence supporting a transaction value of $5,000 under § 666(a)(1)(B), pointing to the amount of the bribes. Likewise, that argument fails for the same reasons discussed above.

---

[8] The Government also argues that the later, FBI sting incidents (i.e., the incidents comprising Counts Two through Four) provide corroborative evidence supporting the conspiracy conviction. The Government discusses these incidents as if they were constituent acts of the conspiracy, but given that Perez was a government informant at that time, at best the evidence only provides context for the earlier wood payments. Regardless, we think there is sufficient evidence to affirm the conviction on Count One without considering these incidents.

## C

In Counts Five through Seven, the Government alleged that Delgado used a phone in connection with the charged federal program bribery offenses in violation of 18 U.S.C. § 1952(a)(3). In relevant part, § 1952(a)(3) prohibits "us[ing] . . . any facility in interstate or foreign commerce, with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity." 18 U.S.C. § 1952(a)(3). "Unlawful activity" includes "bribery . . . in violation of the laws of the State in which committed or of the United States." *Id.* § 1952(b). Phones are considered facilities in interstate commerce. *United States v. Marek*, 238 F.3d 310, 318 (5th Cir. 2001).

There is no real dispute that the § 1952(a)(3) convictions on Counts Five through Seven rise and fall with their corresponding federal program bribery convictions on Counts Two through Four. During both the December 2016 sting (Count Two/Count Five) and the November 2017 sting (Count Three/Count Six), Perez called Delgado on his phone to set up the meetings at Delgado's house where Delgado accepted bribes. Delgado argues only that neither Delgado nor Perez used the word "bribe" during either of these phone calls, and therefore the evidence shows that the phone calls were only used to schedule a meeting of an unknown purpose. But for the same reasons that there was sufficient evidence for the jury to conclude that the December 2016 and November 2017 incidents were instances of bribery, there is sufficient evidence for the jury to conclude that Delgado used his phone to facilitate that unlawful activity.

So too with the January 2018 sting (Count Four/Count Seven). When Perez arrives at the restaurant, Delgado texts him to come inside. Perez replies, asking Delgado to come outside because he had something for him that he did not want to give to him in the restaurant. The same evidence that

No. 19-20697

was sufficient for the jury to conclude that that incident was an act of bribery provides the context to conclude that Delgado used his phone to facilitate an unlawful activity.

In sum, all three of Delgado's convictions under § 1952(a)(3) were supported by sufficient evidence.

D

Finally, Delgado challenges the sufficiency of the evidence supporting his conviction on Count Eight for obstruction of justice in violation of 18 U.S.C. § 1512(c)(2).

Under that section, it is a crime to "corruptly . . . obstruct[], influence[], or impede[] any official proceeding, or attempt[] to do so." 18 U.S.C. § 1512(c)(2). "Though a proceeding need not be actually pending at the time of the obstructive act, 18 U.S.C. § 1512(f), an obstruction of justice conviction requires some 'nexus' between the obstructive act and some official government proceeding." *United States v. Simpson*, 741 F.3d 539, 552 (5th Cir. 2014). And the "proceeding must at least be 'foreseen,' such that the defendant has in contemplation some particular official proceeding" that he intends his conduct would impede or obstruct. *Id.*; *United States v. Bedoy*, 827 F.3d 495, 507 (5th Cir. 2016). An "official proceeding" includes proceedings before a federal grand jury. 18 U.S.C. § 1515(a)(1)(A).

Moreover, a person acts "corruptly" under the statute when they act "knowingly and dishonestly, with specific intent to subvert or undermine the due administration of justice." *United States v. Coppin*, 569 F. App'x 326, 334 (5th Cir. 2014) (per curiam) (unpublished opinion); *see also Bedoy*, 827 F.3d at 510 (approving of *Coppin*'s definition). Such intent can be proven with "circumstantial evidence alone." *Bedoy*, 827 F.3d at 509 (quoting *United States v. Rojas*, 812 F.3d 382, 400 (5th Cir. 2016)).

No. 19-20697

The Government argues that the jury was presented with sufficient evidence to conclude that Delgado obstructed justice (or attempted to obstruct) when, after learning that he might be the target of a federal investigation involving the sale of firewood, he sent Perez a text message stating that he needed to return the $5,500 of cash on the pretense that it was a campaign contribution that needed to be submitted by check.

In support, the Government points to the evidence it presented showing that Delgado was informed by Juan Hinojosa that he was being investigated by the FBI for selling overpriced firewood. It argues this evidence shows that Delgado foresaw that a grand jury investigation involving him might be underway.[9] It further points to the evidence related to the attempted bribe in August 2017, where Delgado suspected that the federal government was investigating corruption in Hidalgo County. The Government asserts the jury could infer that Delgado, having learned of a possible FBI investigation into his actions, sought to cover his tracks by attempting to recast a bribe payment as a campaign contribution.

Delgado argues that he did not know about the existence of a grand jury investigation but merely heard a rumor about a federal investigation "in a civil case unrelated to Perez." He further argues that there was no evidence that the text message sent to Perez actually impeded a federal grand jury, or that he had acted corruptly in sending the message. But these arguments are unavailing; they amount simply to a different interpretation of the evidence presented to the jury.

We hold that there was sufficient evidence for the jury to convict Delgado of obstruction of justice in violation of § 1512(c)(2). The evidence

---

[9] Agent Roncska testified that, by that time, a grand jury investigation had already begun.

presented by the Government was sufficient for the jury to conclude both that Delgado foresaw a grand jury proceeding and that he acted corruptly by attempting to cover his tracks with the text message.

## III

Having affirmed Delgado's convictions, we now address his challenge to his sentence. Delgado argues that the district court incorrectly calculated "the benefit received" in return for the bribe payments under U.S.S.G. §§ 2C1.1(b)(2) and 2B1.1(b)(1) and therefore incorrectly applied a six-level increase to his Guidelines offense level. He challenges only the district court's calculation that the PR bonds awarded by Delgado should be valued at $5,000 (and $10,000, in the case of one of Perez's pre-investigation clients).[10]

This court "typically review[s] the district court's interpretation of the Guidelines de novo and its factual findings for clear error." *United States v. Rodriguez-Leos*, 953 F.3d 320, 324 (5th Cir. 2020).

"The amount of benefit to be received" in exchange for a bribe is a finding of fact. *United States v. Griffin*, 324 F.3d 330, 365 (5th Cir. 2003). Therefore, the district court's calculation of that amount "will be upheld so long as it is 'plausible in light of the record as a whole.'" *United States v. Eustice*, 952 F.3d 686, 691 (5th Cir. 2020) (quoting *United States v. Betancourt*, 422 F.3d 240, 246 (5th Cir. 2005)); *see also United States v. Nguyen*, 854 F.3d 276, 281 (5th Cir. 2017) (explaining that sentencing facts need only be established by a preponderance of the evidence). Moreover,

---

[10] As described above, the district court found wanting the evidence tying the 2008 pickup truck to the conspiracy conviction under Count One. However, as confirmed by Delgado's counsel at oral argument, Delgado does not challenge the inclusion of the $15,000 associated with the truck in the "benefit received" calculation.

when making its calculation, "the district court need not determine the value of the benefit with precision." *Griffin*, 324 F.3d at 366. And because a sentencing judge "is in a unique position to assess the evidence"—especially having presided at trial—its calculations under sections 2C1.1 and 2B1.1 are "entitled to appropriate deference." *United States v. Teel*, 691 F.3d 578, 590 (5th Cir. 2012).

Here, Delgado's argument that the district court erred in calculating the value of the PR bonds for sentencing purposes largely mirrors his argument with respect to the value of the PR bonds for purposes of the transactional element of 18 U.S.C. § 666(a)(1)(B), discussed above. In short, he argues that although the PR bonds would require the recipient to forfeit $5,000 if they violated the terms of the bond, because the recipient had to pay nothing up front the value of the benefit received must be considered less than $5,000.

The Guidelines define "the benefit received" in return for bribe payments as "the net value of such benefit." U.S.S.G. § 2C1.1 cmt. n.3 (2018). While legally distinct from our discussion above regarding the transactional value element of § 666(a)(1)(B), the question of the "net value" of the PR bonds to Perez's clients is conceptually similar. We do not re-analyze the issue in depth. At its core, the "value" someone receives from a PR bond is intertwined with a liberty interest that is hard to definitively quantify. We do not think it was error—let alone clear error—for the district court to value the bonds at the amount Perez's clients were willing to risk forfeiting in order to secure the bonds. We therefore reject Delgado's challenge to his sentence.

## IV

Delgado's conviction and sentence are AFFIRMED.